Justice KAGAN delivered the opinion of the Court.
The Constitution entrusts States with the job of designing congressional districts. But it also imposes an important constraint: A State may not use race as the predominant factor in drawing district lines unless it has a compelling reason. In this case, a three-judge District Court ruled that North Carolina officials violated that bar when they created two districts whose voting-age populations were majority black. Applying a deferential standard of review to the factual findings underlying that decision, we affirm.
I
A
The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans. It prevents a State, in the absence of "sufficient justification," from "separating its citizens into different voting districts on the basis of race." Bethune-Hill v. Virginia State Bd. of Elections, 580 U.S. ----, ----, 137 S.Ct. 788, 797, 197 L.Ed.2d 85 (2017) (internal quotation marks and alteration omitted). When a voter sues state officials for drawing such race-based lines, our decisions call for a two-step analysis.
First, the plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." Miller v. Johnson, 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). That entails demonstrating *1464 that the legislature "subordinated" other factors-compactness, respect for political subdivisions, partisan advantage, what have you-to "racial considerations." Ibid. The plaintiff may make the required showing through "direct evidence" of legislative intent, "circumstantial evidence of a district's shape and demographics," or a mix of both. Ibid.[1]
Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. See Bethune-Hill, 580 U.S., at ----, 137 S.Ct., at 800. The burden thus shifts to the State to prove that its race-based sorting of voters serves a "compelling interest" and is "narrowly tailored" to that end. Ibid . This Court has long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965 (VRA or Act), 79 Stat. 437, as amended, 52 U.S.C. § 10301 et seq . See, e.g., Shaw v. Hunt, 517 U.S. 899, 915, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (Shaw II ).
Two provisions of the VRA-§ 2 and § 5-are involved in this case. §§ 10301, 10304. Section 2 prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right ... to vote on account of race." § 10301(a). We have construed that ban to extend to "vote dilution"-brought about, most relevantly here, by the "dispersal of [a group's members] into districts in which they constitute an ineffective minority of voters." Thornburg v. Gingles, 478 U.S. 30, 46, n. 11, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Section 5, at the time of the districting in dispute, worked through a different mechanism. Before this Court invalidated its coverage formula, see Shelby County v. Holder, 570 U.S. ----, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), that section required certain jurisdictions (including various North Carolina counties) to pre-clear voting changes with the Department of Justice, so as to forestall "retrogression" in the ability of racial minorities to elect their preferred candidates, Beer v. United States, 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976).
When a State invokes the VRA to justify race-based districting, it must show (to meet the "narrow tailoring" requirement) that it had "a strong basis in evidence" for concluding that the statute required its action. Alabama Legislative Black Caucus v. Alabama, 575 U.S. ----, ----, 135 S.Ct. 1257, 1274, 191 L.Ed.2d 314 (2015). Or said otherwise, the State must establish that it had "good reasons" to think that it would transgress the Act if it did not draw race-based district lines. Ibid . That "strong basis" (or "good reasons") standard gives States "breathing room" to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed. Bethune-Hill, 580 U.S., at ----, 137 S.Ct., at 802.
A district court's assessment of a districting plan, in accordance with the two-step inquiry just described, warrants significant deference on appeal to this Court.[2] We of course retain full power to *1465 correct a court's errors of law, at either stage of the analysis. But the court's findings of fact-most notably, as to whether racial considerations predominated in drawing district lines-are subject to review only for clear error. See Fed. Rule Civ. Proc. 52(a)(6) ; Easley v. Cromartie, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (Cromartie II ); id., at 259, 121 S.Ct. 1452 (THOMAS, J., dissenting). Under that standard, we may not reverse just because we "would have decided the [matter] differently." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). A finding that is "plausible" in light of the full record-even if another is equally or more so-must govern. Id., at 574, 105 S.Ct. 1504.
B
This case concerns North Carolina's most recent redrawing of two congressional districts, both of which have long included substantial populations of black voters. In its current incarnation, District 1 is anchored in the northeastern part of the State, with appendages stretching both south and west (the latter into Durham). District 12 begins in the south-central part of the State (where it takes in a large part of Charlotte) and then travels northeast, zig-zagging much of the way to the State's northern border. (Maps showing the districts are included in an appendix to this opinion.) Both have quite the history before this Court.
We first encountered the two districts, in their 1992 versions, in Shaw v. Reno, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). There, we held that voters stated an equal protection claim by alleging that Districts 1 and 12 were unwarranted racial gerrymanders. See id., at 642, 649, 113 S.Ct. 2816. After a remand to the District Court, the case arrived back at our door. See Shaw II, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207. That time, we dismissed the challenge to District 1 for lack of standing, but struck down District 12. The design of that "serpentine" district, we held, was nothing if not race-centric, and could not be justified as a reasonable attempt to comply with the VRA. Id., at 906, 116 S.Ct. 1894 ; see id., at 911-918, 116 S.Ct. 1894.
The next year, the State responded with a new districting plan, including a new District 12-and residents of that district brought another lawsuit alleging an impermissible racial gerrymander. A District Court sustained the claim twice, but both times this Court reversed. See Hunt v. Cromartie, 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (Cromartie I ); Cromartie II, 532 U.S. 234, 121 S.Ct. 1452, 149 L.Ed.2d 430. Racial considerations, we held, did not predominate in designing the revised District 12. Rather, that district was the result of a political gerrymander-an effort to engineer, mostly "without regard to race," a safe Democratic seat. Id., at 245, 121 S.Ct. 1452.
The State redrew its congressional districts again in 2001, to account for population changes revealed in the prior year's census. Under the 2001 map, which went unchallenged in court, neither District 1 nor District 12 had a black voting-age population (called a "BVAP") that was a majority of the whole: The former had a BVAP of around 48%, the latter a BVAP of around 43%. See App. 312, 503. Nonetheless, in five successive general elections conducted in those reconfigured districts, all the candidates preferred by most African-American voters won their contests-and by some handy margins. In District 1, black voters' candidates of choice garnered *1466 as much as 70% of the total vote, and never less than 59%. See 5 Record 636, 638, 641, 645, 647 (Pls. Exh. 112). And in District 12, those candidates won with 72% of the vote at the high end and 64% at the low. See id., at 637, 640, 643, 646, 650.
Another census, in 2010, necessitated yet another congressional map-(finally) the one at issue in this case. State Senator Robert Rucho and State Representative David Lewis, both Republicans, chaired the two committees jointly responsible for preparing the revamped plan. They hired Dr. Thomas Hofeller, a veteran political mapmaker, to assist them in redrawing district lines. Several hearings, drafts, and revisions later, both chambers of the State's General Assembly adopted the scheme the three men proposed.
The new map (among other things) significantly altered both District 1 and District 12. The 2010 census had revealed District 1 to be substantially underpopulated: To comply with the Constitution's one-person-one-vote principle, the State needed to place almost 100,000 new people within the district's boundaries. See App. 2690; Evenwel v. Abbott, 578 U.S. ----, ----, 136 S.Ct. 1120, 1124, 194 L.Ed.2d 291 (2016) (explaining that "[s]tates must draw congressional districts with populations as close to perfect equality as possible"). Rucho, Lewis, and Hofeller chose to take most of those people from heavily black areas of Durham, requiring a finger-like extension of the district's western line. See Appendix, infra . With that addition, District 1's BVAP rose from 48.6% to 52.7%. See App. 312-313. District 12, for its part, had no need for significant total-population changes: It was overpopulated by fewer than 3,000 people out of over 730,000. See id ., at 1150. Still, Rucho, Lewis, and Hofeller decided to reconfigure the district, further narrowing its already snakelike body while adding areas at either end-most relevantly here, in Guilford County. See Appendix, infra ; App. 1164. Those changes appreciably shifted the racial composition of District 12: As the district gained some 35,000 African-Americans of voting age and lost some 50,000 whites of that age, its BVAP increased from 43.8% to 50.7%. See 2 Record 349 (Fourth Affidavit of Dan Frey, Exh. 5); id., at 416 (Exh. 11).
Registered voters in the two districts (David Harris and Christine Bowser, here called "the plaintiffs") brought this suit against North Carolina officials (collectively, "the State" or "North Carolina"), complaining of impermissible racial gerrymanders. After a bench trial, a three-judge District Court held both districts unconstitutional. All the judges agreed that racial considerations predominated in the design of District 1. See Harris v. McCrory, 159 F.Supp.3d 600, 611 (M.D.N.C.2016). And in then applying strict scrutiny, all rejected the State's argument that it had a "strong basis" for thinking that the VRA compelled such a race-based drawing of District 1's lines. Id., at 623. As for District 12, a majority of the panel held that "race predominated" over all other factors, including partisanship. Id., at 622. And the court explained that the State had failed to put forward any reason, compelling or otherwise, for its attention to race in designing that district. See ibid. Judge Osteen dissented from the conclusion that race, rather than politics, drove District 12's lines-yet still characterized the majority's view as "[e]minently reasonable." Id., at 640.
The State filed a notice of appeal, and we noted probable jurisdiction. McCrory v. Harris, 579 U.S. ----, 136 S.Ct. 2512, 195 L.Ed.2d 838 (2016).
*1467 II
We address at the outset North Carolina's contention that a victory it won in a very similar state-court lawsuit should dictate (or at least influence) our disposition of this case. As the State explains, the North Carolina NAACP and several other civil rights groups challenged Districts 1 and 12 in state court immediately after their enactment, charging that they were unlawful racial gerrymanders. See Brief for Appellants 19-20. By the time the plaintiffs before us filed this action, the state trial court, in Dickson v. Rucho, had rejected those claims-finding that in District 1 the VRA justified the General Assembly's use of race and that in District 12 race was not a factor at all. See App. 1969. The North Carolina Supreme Court then affirmed that decision by a 4-3 vote, applying the state-court equivalent of clear error review. See Dickson v. Rucho, 368 N.C. 481, 500, 781 S.E.2d 404, 419 (2015), modified on denial of reh'g, 368 N.C. 673, 789 S.E.2d 436 (2016), cert. pending, No. 16-24. In this Court, North Carolina makes two related arguments based on the Dickson litigation: first, that the state trial court's judgment should have barred this case altogether, under familiar principles of claim and issue preclusion; and second, that the state court's conclusions should cause us to conduct a "searching review" of the decision below, rather than deferring (as usual) to its factual findings. Reply Brief 6.
The State's preclusion theory rests on an assertion about how the plaintiffs in the two cases are affiliated. As the State acknowledges, one person's lawsuit generally does not bar another's, no matter how similar they are in substance. See Taylor v. Sturgell, 553 U.S. 880, 892-893, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) (noting the "deep-rooted historic tradition that everyone should have his own day in court"). But when plaintiffs in two cases have a special relationship, a judgment against one can indeed bind both. See id., at 893-895, 128 S.Ct. 2161 (describing six categories of qualifying relationships). The State contends that Harris and Bowser, the plaintiffs here, are members of organizations that were plaintiffs in Dickson . And according to North Carolina, that connection prevents the pair from raising anew the questions that the state court previously resolved against those groups. See Brief for Appellants 20-21.
But North Carolina never satisfied the District Court that the alleged affiliation really existed. When the State argued that its preclusion theory entitled it to summary judgment, Harris and Bowser responded that they were not members of any of the organizations that had brought the Dickson suit. See 3 Record 1577-1582 (Defs. Motion for Summary Judgment); 4 Record 101-106 (Pls. Opposition to Motion for Summary Judgment). The parties' dueling contentions turned on intricate issues about those groups' membership policies (e.g., could Harris's payment of dues to the national NAACP, or Bowser's financial contribution to the Mecklenburg County NAACP, have made either a member of the state branch?). Because of those unresolved "factual disputes," the District Court denied North Carolina's motion for summary judgment. 4 Record 238 (July 29, 2014 Order). And nothing in the subsequent trial supported the State's assertion about Harris's and Bowser's organizational ties: Indeed, the State chose not to present any further evidence relating to the membership issue. Based on the resulting record, the District Court summarily rejected the State's claim that Harris and Bowser were something other than independent plaintiffs. See 159 F.Supp.3d, at 609.
*1468 That conclusion defeats North Carolina's attempt to argue for claim or issue preclusion here. We have no basis for assessing the factual assertions underlying the State's argument any differently than the District Court did. Nothing in the State's evidence clearly rebuts Harris's and Bowser's testimony that they never joined any of the Dickson groups. We need not decide whether the alleged memberships would have supported preclusion if they had been proved. It is enough that the District Court reasonably thought they had not.
The State's back-up argument about our standard of review also falls short. The rule that we review a trial court's factual findings for clear error contains no exception for findings that diverge from those made in another court. See Fed. Rule Civ. Proc. 52(a)(6) ("Findings of fact ... must not be set aside unless clearly erroneous"); see also Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion) (applying the same standard to a state court's findings). Whatever findings are under review receive the benefit of deference, without regard to whether a court in a separate suit has seen the matter differently. So here, we must ask not which court considering Districts 1 and 12 had the better view of the facts, but simply whether the court below's view is clearly wrong. That does not mean the state court's decision is wholly irrelevant: It is common sense that, all else equal, a finding is more likely to be plainly wrong if some judges disagree with it. Cf. Glossip v. Gross, 576 U.S. ----, ----, 135 S.Ct. 2726, 2740, 192 L.Ed.2d 761 (2015) (noting that we are even less likely to disturb a factual determination when "multiple trial courts have reached the same finding"). But the very premise of clear error review is that there are often "two permissible"-because two "plausible"-"views of the evidence." Anderson, 470 U.S., at 574, 105 S.Ct. 1504 ; see supra, at 1465. Even assuming the state court's findings capture one such view, the District Court's assessment may yet represent another. And the permissibility of the District Court's account is the only question before us.
III
With that out of the way, we turn to the merits of this case, beginning (appropriately enough) with District 1. As noted above, the court below found that race furnished the predominant rationale for that district's redesign. See supra, at 1466 - 1467. And it held that the State's interest in complying with the VRA could not justify that consideration of race. See supra, at 1466 - 1467. We uphold both conclusions.
A
Uncontested evidence in the record shows that the State's mapmakers, in considering District 1, purposefully established a racial target: African-Americans should make up no less than a majority of the voting-age population. See 159 F.Supp.3d, at 611-614. Senator Rucho and Representative Lewis were not coy in expressing that goal. They repeatedly told their colleagues that District 1 had to be majority-minority, so as to comply with the VRA. During a Senate debate, for example, Rucho explained that District 1 "must include a sufficient number of African-Americans" to make it "a majority black district." App. 689-690. Similarly, Lewis informed the House and Senate redistricting committees that the district must have "a majority black voting age population." Id ., at 606. And that objective was communicated in no uncertain terms to the legislators' consultant. Dr. Hofeller testified multiple times at trial that *1469 Rucho and Lewis instructed him "to draw [District 1] with a [BVAP] in excess of 50 percent." 159 F.Supp.3d, at 613 ; see, e.g.,ibid. ("Once again, my instructions [were] that the district had to be drawn at above 50 percent").
Hofeller followed those directions to the letter, such that the 50%-plus racial target "had a direct and significant impact" on District 1's configuration. Alabama, 575 U.S., at ----, 135 S.Ct., at 1271. In particular, Hofeller moved the district's borders to encompass the heavily black parts of Durham (and only those parts), thus taking in tens of thousands of additional African-American voters. That change and similar ones, made (in his words) to ensure that the district's racial composition would "add[ ] up correctly," deviated from the districting practices he otherwise would have followed. App. 2802. Hofeller candidly admitted that point: For example, he testified, he sometimes could not respect county or precinct lines as he wished because "the more important thing" was to create a majority-minority district. Id ., at 2807; see id ., at 2809. The result is a district with stark racial borders: Within the same counties, the portions that fall inside District 1 have black populations two to three times larger than the portions placed in neighboring districts. See Brief for United States as Amicus Curiae 19; cf. Alabama, 575 U.S., at ---- - ----, 135 S.Ct., at 1271-1272 (relying on similar evidence to find racial predominance).
Faced with this body of evidence-showing an announced racial target that subordinated other districting criteria and produced boundaries amplifying divisions between blacks and whites-the District Court did not clearly err in finding that race predominated in drawing District 1. Indeed, as all three judges recognized, the court could hardly have concluded anything but. See 159 F.Supp.3d, at 611 (calling District 1 a "textbook example" of race-based districting).[3]
B
The more substantial question is whether District 1 can survive the strict scrutiny applied to racial gerrymanders. As noted earlier, we have long assumed that complying with the VRA is a compelling interest. See supra, at 1463 - 1464. And we have held that race-based districting is narrowly tailored to that objective if a State had "good reasons" for thinking that the Act demanded such steps. See supra, at 1464. North Carolina argues that District 1 passes muster under that standard: The General Assembly (so says the State) had "good reasons to believe it needed to draw [District 1] as a majority-minority district to avoid Section 2 liability" for vote dilution. Brief for Appellants 52. We now turn to that defense.
*1470 This Court identified, in Thornburg v. Gingles, three threshold conditions for proving vote dilution under § 2 of the VRA. See 478 U.S., at 50-51, 106 S.Ct. 2752. First, a "minority group" must be "sufficiently large and geographically compact to constitute a majority" in some reasonably configured legislative district. Id., at 50, 106 S.Ct. 2752. Second, the minority group must be "politically cohesive." Id., at 51, 106 S.Ct. 2752. And third, a district's white majority must "vote [ ] sufficiently as a bloc" to usually "defeat the minority's preferred candidate." Ibid . Those three showings, we have explained, are needed to establish that "the minority [group] has the potential to elect a representative of its own choice" in a possible district, but that racially polarized voting prevents it from doing so in the district as actually drawn because it is "submerg[ed] in a larger white voting population." Growe v. Emison, 507 U.S. 25, 40, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). If a State has good reason to think that all the "Gingles preconditions" are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. See Bush v. Vera, 517 U.S. 952, 978, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion). But if not, then not.
Here, electoral history provided no evidence that a § 2 plaintiff could demonstrate the third Gingles prerequisite-effective white bloc-voting.[4] For most of the twenty years prior to the new plan's adoption, African-Americans had made up less than a majority of District 1's voters; the district's BVAP usually hovered between 46% and 48%. See 159 F.Supp.3d, at 606 ; App. 312. Yet throughout those two decades, as the District Court noted, District 1 was "an extraordinarily safe district for African-American preferred candidates." 159 F.Supp.3d, at 626. In the closest election during that period, African-Americans' candidate of choice received 59% of the total vote; in other years, the share of the vote garnered by those candidates rose to as much as 70%. See supra, at 1465 - 1466. Those victories (indeed, landslides) occurred because the district's white population did not "vote [ ] sufficiently as a bloc" to thwart black voters' preference, Gingles, 478 U.S., at 51, 106 S.Ct. 2752 ; rather, a meaningful number of white voters joined a politically cohesive black community to elect that group's favored candidate. In the lingo of voting law, District 1 functioned, election year in and election year out, as a "crossover" district, in which members of the majority help a "large enough" minority to elect its candidate of choice. Bartlett v. Strickland, 556 U.S. 1, 13, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (plurality opinion). When voters act in that way, "[i]t is difficult to see how the majority-bloc-voting requirement could be met"-and hence how § 2 liability could be established. Id., at 16, 129 S.Ct. 1231. So experience gave the State no reason to think that the VRA required it to ramp up District 1's BVAP.
The State counters that, in this context, past performance is no guarantee of future results. See Brief for Appellants 57-58; Reply Brief 19-20. Recall here that the State had to redraw its whole congressional map following the 2010 census. See supra, at 1465 - 1466. And in particular, *1471 the State had to add nearly 100,000 new people to District 1 to meet the one-person-one-vote standard. See supra, at 1466. That meant about 13% of the voters in the new district would never have voted there before. See App. 2690; Reply Brief 20. So, North Carolina contends, the question facing the state mapmakers was not whether the then-existing District 1 violated § 2. Rather, the question was whether the future District 1 would do so if drawn without regard to race. And that issue, the State claims, could not be resolved by "focusing myopically on past elections." Id., at 19.
But that reasoning, taken alone, cannot justify North Carolina's race-based redesign of District 1. True enough, a legislature undertaking a redistricting must assess whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements. And true too, an inescapable influx of additional voters into a district may suggest the possibility that its former track record of compliance can continue only if the legislature intentionally adjusts its racial composition. Still, North Carolina too far downplays the significance of a longtime pattern of white crossover voting in the area that would form the core of the redrawn District 1. See Gingles, 478 U.S., at 57, 106 S.Ct. 2752 (noting that longtime voting patterns are highly probative of racial polarization). And even more important, North Carolina can point to no meaningful legislative inquiry into what it now rightly identifies as the key issue: whether a new, enlarged District 1, created without a focus on race but however else the State would choose, could lead to § 2 liability. The prospect of a significant population increase in a district only raises-it does not answer-the question whether § 2 requires deliberate measures to augment the district's BVAP. (Indeed, such population growth could cut in either direction, depending on who comes into the district.) To have a strong basis in evidence to conclude that § 2 demands such race-based steps, the State must carefully evaluate whether a plaintiff could establish the Gingles preconditions-including effective white bloc-voting-in a new district created without those measures. We see nothing in the legislative record that fits that description.[5]
And that absence is no accident: Rucho and Lewis proceeded under a wholly different theory-arising not from Gingles but from Bartlett v. Strickland -of what § 2 demanded in drawing District 1. Strickland involved a geographic area in which African-Americans could not form a majority of a reasonably compact district. See 556 U.S., at 8, 129 S.Ct. 1231 (plurality opinion). The African- *1472 American community, however, was sizable enough to enable the formation of a crossover district, in which a substantial bloc of black voters, if receiving help from some white ones, could elect the candidates of their choice. See supra, at 1470 - 1471. A plurality of this Court, invoking the first Gingles precondition, held that § 2 did not require creating that district: When a minority group is not sufficiently large to make up a majority in a reasonably shaped district, § 2 simply does not apply. See 556 U.S., at 18-20, 129 S.Ct. 1231. Over and over in the legislative record, Rucho and Lewis cited Strickland as mandating a 50%-plus BVAP in District 1. See App. 355-356, 363-364, 472-474, 609-610, 619, 1044. They apparently reasoned that if, as Strickland held, § 2 does not require crossover districts (for groups insufficiently large under Gingles ), then § 2 also cannot be satisfied by crossover districts (for groups in fact meeting Gingles ' size condition). In effect, they concluded, whenever a legislature can draw a majority-minority district, it must do so-even if a crossover district would also allow the minority group to elect its favored candidates. See 1 Tr. 21-22 (counsel's explanation that "the [S]tate interpreted" Strickland to say that, in order to protect African-Americans' electoral strength and thus avoid § 2 liability, the BVAP in District 1 "need [ed] to be above 50 percent").
That idea, though, is at war with our § 2 jurisprudence-Strickland included. Under the State's view, the third Gingles condition is no condition at all, because even in the absence of effective white bloc-voting, a § 2 claim could succeed in a district (like the old District 1) with an under-50% BVAP. But this Court has made clear that unless each of the three Gingles prerequisites is established, "there neither has been a wrong nor can be a remedy." Growe, 507 U.S., at 41, 113 S.Ct. 1075. And Strickland, far from supporting North Carolina's view, underscored the necessity of demonstrating effective white bloc-voting to prevail in a § 2 vote-dilution suit. The plurality explained that "[i]n areas with substantial crossover voting," § 2 plaintiffs would not "be able to establish the third Gingles precondition" and so "majority-minority districts would not be required." 556 U.S., at 24, 129 S.Ct. 1231 ; see also ibid. (noting that States can "defend against alleged § 2 violations by pointing to crossover voting patterns and to effective crossover districts"). Thus, North Carolina's belief that it was compelled to redraw District 1 (a successful crossover district) as a majority-minority district rested not on a "strong basis in evidence," but instead on a pure error of law. Alabama, 575 U.S., at ----, 135 S.Ct., at 1274.
In sum: Although States enjoy leeway to take race-based actions reasonably judged necessary under a proper interpretation of the VRA, that latitude cannot rescue District 1. We by no means "insist that a state legislature, when redistricting, determine precisely what percent minority population [§ 2 of the VRA] demands." Ibid . But neither will we approve a racial gerrymander whose necessity is supported by no evidence and whose raison d'être is a legal mistake. Accordingly, we uphold the District Court's conclusion that North Carolina's use of race as the predominant factor in designing District 1 does not withstand strict scrutiny.
IV
We now look west to District 12, making its fifth(!) appearance before this Court. This time, the district's legality turns, and turns solely, on which of two possible reasons predominantly explains its most recent reconfiguration. The plaintiffs contended at trial that the General *1473 Assembly chose voters for District 12, as for District 1, because of their race; more particularly, they urged that the Assembly intentionally increased District 12's BVAP in the name of ensuring preclearance under the VRA's § 5. But North Carolina declined to mount any defense (similar to the one we have just considered for District 1) that § 5's requirements in fact justified race-based changes to District 12-perhaps because § 5 could not reasonably be understood to have done so, see n. 10, infra . Instead, the State altogether denied that racial considerations accounted for (or, indeed, played the slightest role in) District 12's redesign. According to the State's version of events, Senator Rucho, Representative Lewis, and Dr. Hofeller moved voters in and out of the district as part of a "strictly" political gerrymander, without regard to race. 6 Record 1011. The mapmakers drew their lines, in other words, to "pack" District 12 with Democrats, not African-Americans. After hearing evidence supporting both parties' accounts, the District Court accepted the plaintiffs'.[6]
Getting to the bottom of a dispute like this one poses special challenges for a trial court. In the more usual case alleging a racial gerrymander-where no one has raised a partisanship defense-the court can make real headway by exploring the challenged district's conformity to traditional districting principles, such as compactness and respect for county lines. In Shaw II, for example, this Court emphasized the "highly irregular" shape of then-District 12 in concluding that race predominated in its design. 517 U.S., at 905, 116 S.Ct. 1894 (internal quotation marks omitted). But such evidence loses much of its value when the State asserts partisanship as a defense, because a bizarre shape-as of the new District 12-can arise from a "political motivation" as well as a racial one. Cromartie I, 526 U.S., at 547, n. 3, 119 S.Ct. 1545. And crucially, political and racial reasons are capable of yielding similar oddities in a district's boundaries. That is because, of course, "racial identification is highly correlated with political affiliation." Cromartie II, 532 U.S., at 243, 121 S.Ct. 1452. As a result of those redistricting realities, a trial court has a formidable task: It must make "a sensitive inquiry" into all "circumstantial and direct evidence of intent" to assess whether the plaintiffs have managed to disentangle race from politics and prove that the former drove a district's lines. Cromartie I, 526 U.S., at 546, 119 S.Ct. 1545 (internal quotation marks omitted).[7]
*1474 Our job is different-and generally easier. As described earlier, we review a district court's finding as to racial predominance only for clear error, except when the court made a legal mistake. See supra, at 1464 - 1465. Under that standard of review, we affirm the court's finding so long as it is "plausible"; we reverse only when "left with the definite and firm conviction that a mistake has been committed." Anderson, 470 U.S., at 573-574, 105 S.Ct. 1504 ; see supra, at 1465. And in deciding which side of that line to come down on, we give singular deference to a trial court's judgments about the credibility of witnesses. See Fed. Rule Civ. Proc. 52(a)(6). That is proper, we have explained, because the various cues that "bear so heavily on the listener's understanding of and belief in what is said" are lost on an appellate court later sifting through a paper record. Anderson, 470 U.S., at 575, 105 S.Ct. 1504.[8]
In light of those principles, we uphold the District Court's finding of racial predominance respecting District 12. The evidence offered at trial, including live witness testimony subject to credibility determinations, adequately supports the conclusion that race, not politics, accounted for the district's reconfiguration. And no error of law infected that judgment: Contrary to North Carolina's view, the District Court had no call to dismiss this challenge just because the plaintiffs did not proffer an alternative design for District 12 as circumstantial evidence of the legislature's intent.
A
Begin with some facts and figures, showing how the redistricting of District 12 affected its racial composition. As explained above, District 12 (unlike District 1) was approximately the right size as it was: North Carolina did not-indeed, could not-much change its total population. See supra, at 1466. But by further slimming the district and adding a couple of knobs to its snakelike body (including in Guilford County), the General Assembly incorporated tens of thousands of new voters and pushed out tens of thousands of old ones. And those changes followed racial lines: To be specific, the new District 12 had 35,000 more African-Americans of voting age and 50,000 fewer whites of that age. (The difference was made up of voters from other racial categories.) See *1475 ibid . Those voter exchanges produced a sizable jump in the district's BVAP, from 43.8% to 50.7%. See ibid. The Assembly thus turned District 12 (as it did District 1, see supra, at 1468 - 1469) into a majority-minority district.
As the plaintiffs pointed out at trial, Rucho and Lewis had publicly stated that racial considerations lay behind District 12's augmented BVAP. In a release issued along with their draft districting plan, the two legislators ascribed that change to the need to achieve preclearance of the plan under § 5 of the VRA. See App. 358. At that time, § 5 covered Guilford County and thus prohibited any "retrogression in the [electoral] position of racial minorities" there. Beer, 425 U.S., at 141, 96 S.Ct. 1357 ; see 31 Fed.Reg. 5081 (1966). And part of Guilford County lay within District 12, which meant that the Department of Justice would closely scrutinize that district's new lines. In light of those facts, Rucho and Lewis wrote: "Because of the presence of Guilford County in the Twelfth District, we have drawn our proposed Twelfth District at a [BVAP] level that is above the percentage of [BVAP] found in the current Twelfth District." App. 358. According to the two legislators, that race-based "measure w[ould] ensure preclearance of the plan." Ibid. Thus, the District Court found, Rucho's and Lewis's own account "evince[d] intentionality" as to District 12's racial composition: Because of the VRA, they increased the number of African-Americans. 159 F.Supp.3d, at 617.
Hofeller confirmed that intent in both deposition testimony and an expert report. Before the redistricting, Hofeller testified, some black residents of Guilford County fell within District 12 while others fell within neighboring District 13. The legislators, he continued, "decided to reunite the black community in Guilford County into the Twelfth." App. 558; see id., at 530-531. Why? Hofeller responded, in language the District Court emphasized: "[I]n order to be cautious and draw a plan that would pass muster under the Voting Rights Act." Id., at 558; see 159 F.Supp.3d, at 619. Likewise, Hofeller's expert report highlighted the role of the VRA in altering District 12's lines. "[M]indful that Guilford County was covered" by § 5, Hofeller explained, the legislature "determined that it was prudent to reunify [the county's] African-American community" into District 12. App. 1103. That change caused the district's compactness to decrease (in expert-speak, it "lowered the Reock Score"), but that was a sacrifice well worth making: It would "avoid the possibility of a[VRA] charge" that would "inhibit [ ] preclearance." Ibid.
The State's preclearance submission to the Justice Department indicated a similar determination to concentrate black voters in District 12. "One of the concerns of the Redistricting Chairs," North Carolina there noted, had to do with the Justice Department's years-old objection to "a failure by the State to create a second majority minority district" (that is, in addition to District 1). Id ., at 478. The submission then went on to explain that after considering alternatives, the redistricters had designed a version of District 12 that would raise its BVAP to 50.7%. Thus, concluded the State, the new District 12 "increases[ ] the African-American community's ability to elect their candidate of choice." Id ., at 479. In the District Court's view, that passage once again indicated that making District 12 majority-minority was no "mere coincidence," but a deliberate attempt to avoid perceived obstacles to preclearance. 159 F.Supp.3d, at 617.[9]
*1476 And still there was more: Perhaps the most dramatic testimony in the trial came when Congressman Mel Watt (who had represented District 12 for some 20 years) recounted a conversation he had with Rucho in 2011 about the district's future make-up. According to Watt, Rucho said that "his leadership had told him that he had to ramp the minority percentage in [District 12] up to over 50 percent to comply with the Voting Rights Law." App. 2369; see id ., at 2393. And further, that it would then be Rucho's "job to go and convince the African-American community" that such a racial target "made sense" under the Act. Ibid. ; see id ., at 2369.[10] The District Court credited Watt's testimony about the conversation, citing his courtroom demeanor and "consistent recollection" under "probing cross-examination." 159 F.Supp.3d, at 617-618.[11] In the court's view, Watt's account was of a piece with all the other evidence-including the redistricters' on-the-nose attainment of a 50% BVAP-indicating that the General Assembly, in the name of VRA compliance, deliberately redrew District 12 as a majority-minority district. See id., at 618.[12]
The State's contrary story-that politics alone drove decisionmaking-came into the trial mostly through Hofeller's testimony. Hofeller explained that Rucho and Lewis instructed him, first and foremost, to make the map as a whole "more favorable to Republican candidates." App. 2682. One agreed-on stratagem in that effort was to pack the historically Democratic District 12 with even more Democratic voters, thus leaving surrounding districts more reliably Republican. See id ., at 2682-2683, 2696-2697. To that end, Hofeller recounted, he drew District 12's new boundaries based on political data-specifically, the voting behavior of precincts in the 2008 Presidential election between Barack Obama and John McCain. See id ., at 2701-2702. Indeed, he claimed, he displayed only this data, and no racial data, on his computer screen while mapping the district. See id ., at 2721. In part of his testimony, Hofeller further stated that the Obama-McCain election data explained *1477 (among other things) his incorporation of the black, but not the white, parts of Guilford County then located in District 13. See id ., at 2824. Only after he drew a politics-based line between those adjacent areas, Hofeller testified, did he "check[ ]" the racial data and "f[ind] out" that the resulting configuration of District 12 "did not have a[§ 5] issue." Id ., at 2822.
The District Court, however, disbelieved Hofeller's asserted indifference to the new district's racial composition. The court recalled Hofeller's contrary deposition testimony-his statement (repeated in only slightly different words in his expert report) that Rucho and Lewis "decided" to shift African-American voters into District 12 "in order to" ensure preclearance under § 5. See 159 F.Supp.3d, at 619-620 ; App. 558. And the court explained that even at trial, Hofeller had given testimony that undermined his "blame it on politics" claim. Right after asserting that Rucho and Lewis had told him "[not] to use race" in designing District 12, Hofeller added a qualification: "except perhaps with regard to Guilford County." Id ., at 2791; see id ., at 2790. As the District Court understood, that is the kind of "exception" that goes pretty far toward swallowing the rule. District 12 saw a net increase of more than 25,000 black voters in Guilford County, relative to a net gain of fewer than 35,000 across the district: So the newly added parts of that county played a major role in pushing the district's BVAP over 50%. See id ., at 384, 500-502.[13] The District Court came away from Hofeller's self-contradictory testimony unpersuaded that this decisive influx of black voters was an accident. Whether the racial make-up of the county was displayed on his computer screen or just fixed in his head, the court thought, Hofeller's denial of race-based districting "r[ang] hollow." 159 F.Supp.3d, at 620, n. 8.
Finally, an expert report by Dr. Stephen Ansolabehere lent circumstantial support to the plaintiffs' race-not-politics case. Ansolabehere looked at the six counties overlapping with District 12-essentially the region from which the mapmakers could have drawn the district's population. The question he asked was: Who from those counties actually ended up in District 12? The answer he found was: Only 16% of the region's white registered voters, but 64% of the black ones. See App. 321-322. Ansolabehere next controlled for party registration, but discovered that doing so made essentially no difference: For example, only 18% of the region's white Democrats wound up in District 12, whereas 65% of the black Democrats did. See id., at 332. The upshot was that, regardless of party, a black voter was three to four times more likely than a white voter to cast his ballot within District 12's borders. See ibid. Those stark disparities led Ansolabehere to conclude that "race, and not party," was "the dominant factor" in District 12's design. Id ., at 337.[14] His report, *1478 as the District Court held, thus tended to confirm the plaintiffs' direct evidence of racial predominance. See 159 F.Supp.3d, at 620-621.
The District Court's assessment that all this evidence proved racial predominance clears the bar of clear error review. The court emphasized that the districting plan's own architects had repeatedly described the influx of African-Americans into District 12 as a § 5 compliance measure, not a side-effect of political gerrymandering. And those contemporaneous descriptions comported with the court's credibility determinations about the trial testimony-that Watt told the truth when he recounted Rucho's resolve to hit a majority-BVAP target; and conversely that Hofeller skirted the truth (especially as to Guilford County) when he claimed to have followed only race-blind criteria in drawing district lines. We cannot disrespect such credibility judgments. See Anderson, 470 U.S., at 575, 105 S.Ct. 1504 (A choice to believe "one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence," can "virtually never be clear error"). And more generally, we will not take it upon ourselves to weigh the trial evidence as if we were the first to hear it. See id., at 573, 105 S.Ct. 1504 (A "reviewing court oversteps" under Rule 52(a)"if it undertakes to duplicate the role of the lower court"). No doubt other interpretations of that evidence were permissible. Maybe we would have evaluated the testimony differently had we presided over the trial; or then again, maybe we would not have. Either way-and it is only this which matters-we are far from having a "definite and firm conviction" that the District Court made a mistake in concluding from the record before it that racial considerations predominated in District 12's design.
B
The State mounts a final, legal rather than factual, attack on the District Court's finding of racial predominance. When race and politics are competing explanations of a district's lines, argues North Carolina, the party challenging the district must introduce a particular kind of circumstantial evidence: "an alternative [map] that achieves the legislature's political objectives while improving racial balance." Brief for Appellants 31 (emphasis deleted). That is true, the State says, irrespective of what other evidence is in the case-so even if the plaintiff offers powerful direct proof that the legislature adopted the map it did for racial reasons. See Tr. of Oral Arg. 8. Because the plaintiffs here (as all agree) did not present such a counter-map, *1479 North Carolina concludes that they cannot prevail. The dissent echoes that argument. See post, at 1488 - 1491.
We have no doubt that an alternative districting plan, of the kind North Carolina describes, can serve as key evidence in a race-versus-politics dispute. One, often highly persuasive way to disprove a State's contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district. If you were really sorting by political behavior instead of skin color (so the argument goes) you would have done-or, at least, could just as well have done-this . Such would-have, could-have, and (to round out the set) should-have arguments are a familiar means of undermining a claim that an action was based on a permissible, rather than a prohibited, ground. See, e.g., Miller-El v. Dretke, 545 U.S. 231, 249, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("If that were the [real] explanation for striking [juror] Warren[,] the prosecutors should have struck [juror] Jenkins" too).
But they are hardly the only means. Suppose that the plaintiff in a dispute like this one introduced scores of leaked emails from state officials instructing their mapmaker to pack as many black voters as possible into a district, or telling him to make sure its BVAP hit 75%. Based on such evidence, a court could find that racial rather than political factors predominated in a district's design, with or without an alternative map. And so too in cases lacking that kind of smoking gun, as long as the evidence offered satisfies the plaintiff's burden of proof. In Bush v. Vera, for example, this Court upheld a finding of racial predominance based on "substantial direct evidence of the legislature's racial motivations"-including credible testimony from political figures and statements made in a § 5 preclearance submission-plus circumstantial evidence that redistricters had access to racial, but not political, data at the "block-by-block level" needed to explain their "intricate" designs. See 517 U.S., at 960-963, 116 S.Ct. 1941 (plurality opinion). Not a single Member of the Court thought that the absence of a counter-map made any difference. Similarly, it does not matter in this case, where the plaintiffs' introduction of mostly direct and some circumstantial evidence-documents issued in the redistricting process, testimony of government officials, expert analysis of demographic patterns-gave the District Court a sufficient basis, sans any map, to resolve the race-or-politics question.
A plaintiff's task, in other words, is simply to persuade the trial court-without any special evidentiary prerequisite-that race (not politics) was the "predominant consideration in deciding to place a significant number of voters within or without a particular district." Alabama, 575 U.S., at ----, 135 S.Ct., at 1265 (internal quotation marks omitted); cf. Bethune-Hill, 580 U.S., at ----, ----, 137 S.Ct., at 798, 799 (rejecting a similar effort to elevate one form of "persuasive circumstantial evidence" in a dispute respecting racial predominance to a "mandatory precondition" or "threshold requirement" of proof). That burden of proof, we have often held, is "demanding." E.g., Cromartie II, 532 U.S., at 241, 121 S.Ct. 1452. And because that is so, a plaintiff will sometimes need an alternative map, as a practical matter, to make his case. But in no area of our equal protection law have we forced plaintiffs to submit one particular form of proof to prevail. See Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-268, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (offering a varied and non-exhaustive list of "subjects *1480 of proper inquiry in determining whether racially discriminatory intent existed"). Nor would it make sense to do so here. The Equal Protection Clause prohibits the unjustified drawing of district lines based on race. An alternative map is merely an evidentiary tool to show that such a substantive violation has occurred; neither its presence nor its absence can itself resolve a racial gerrymandering claim.[15]
North Carolina insists, however, that we have already said to the contrary-more particularly, that our decision in Cromartie II imposed a non-negotiable "alternative-map requirement." Brief for Appellants 31. As the State observes, Cromartie II reversed as clearly erroneous a trial court's finding that race, rather than politics, predominated in the assignment of voters to an earlier incarnation of District 12. See 532 U.S., at 241, 121 S.Ct. 1452 ; supra, at 1465 - 1466. And as the State emphasizes, a part of our opinion faulted the Cromartie plaintiffs for failing to offer a convincing account of how the legislature could have accomplished its political goals other than through the map it chose. See 532 U.S., at 257-258, 121 S.Ct. 1452. We there stated:
"In a case such as this one where majority-minority districts ... are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would have brought about significantly greater racial balance." Id., at 258, 121 S.Ct. 1452.
According to North Carolina, that passage alone settles this case, because it makes an alternative map "essential" to a finding that District 12 (a majority-minority district in which race and partisanship are correlated) was a racial gerrymander. Reply Brief 11. Once again, the dissent says the same. See post, at 1489.
But the reasoning of Cromartie II belies that reading. The Court's opinion nowhere *1481 attempts to explicate or justify the categorical rule that the State claims to find there. (Certainly the dissent's current defense of that rule, see post, at 1489 - 1491, was nowhere in evidence.) And given the strangeness of that rule-which would treat a mere form of evidence as the very substance of a constitutional claim, see supra, at 1478 - 1480-we cannot think that the Court adopted it without any explanation. Still more, the entire thrust of the Cromartie II opinion runs counter to an inflexible counter-map requirement. If the Court had adopted that rule, it would have had no need to weigh each piece of evidence in the case and determine whether, taken together, they were "adequate" to show "the predominance of race in the legislature's line-drawing process." 532 U.S., at 243-244, 121 S.Ct. 1452. But that is exactly what Cromartie II did, over a span of 20 pages and in exhaustive detail. Item by item, the Court discussed and dismantled the supposed proof, both direct and circumstantial, of race-based redistricting. All that careful analysis would have been superfluous-that dogged effort wasted-if the Court viewed the absence or inadequacy of a single form of evidence as necessarily dooming a gerrymandering claim.
Rightly understood, the passage from Cromartie II had a different and narrower point, arising from and reflecting the evidence offered in that case. The direct evidence of a racial gerrymander, we thought, was extremely weak: We said of one piece that it "says little or nothing about whether race played a predominant role" in drawing district lines; we said of another that it "is less persuasive than the kinds of direct evidence we have found significant in other redistricting cases." Id., at 253-254, 121 S.Ct. 1452 (emphasis deleted). Nor did the report of the plaintiffs' expert impress us overmuch: In our view, it "offer[ed] little insight into the legislature's true motive." Id., at 248, 121 S.Ct. 1452. That left a set of arguments of the would-have-could-have variety. For example, the plaintiffs offered several maps purporting to "show how the legislature might have swapped" some mostly black and mostly white precincts to obtain greater racial balance "without harming [the legislature's] political objective." Id., at 255, 121 S.Ct. 1452 (internal quotation marks omitted). But the Court determined that none of those proposed exchanges would have worked as advertised-essentially, that the plaintiffs' "you could have redistricted differently" arguments failed on their own terms. See id., at 254-257, 121 S.Ct. 1452. Hence emerged the demand quoted above, for maps that would actually show what the plaintiffs' had not. In a case like Cromartie II -that is, one in which the plaintiffs had meager direct evidence of a racial gerrymander and needed to rely on evidence of forgone alternatives-only maps of that kind could carry the day. Id., at 258, 121 S.Ct. 1452.
But this case is most unlike Cromartie II, even though it involves the same electoral district some twenty years on. This case turned not on the possibility of creating more optimally constructed districts, but on direct evidence of the General Assembly's intent in creating the actual District 12, including many hours of trial testimony subject to credibility determinations. That evidence, the District Court plausibly found, itself satisfied the plaintiffs' burden of debunking North Carolina's "it was really politics" defense; there was no need for an alternative map to do the same job. And we pay our precedents no respect when we extend them far beyond the circumstances for which they were designed.
V
Applying a clear error standard, we uphold the District Court's conclusions that *1482 racial considerations predominated in designing both District 1 and District 12. For District 12, that is all we must do, because North Carolina has made no attempt to justify race-based districting there. For District 1, we further uphold the District Court's decision that § 2 of the VRA gave North Carolina no good reason to reshuffle voters because of their race. We accordingly affirm the judgment of the District Court.
It is so ordered .
Justice GORSUCH took no part in the consideration or decision of this case.
APPENDIX
?
?
?

A plaintiff succeeds at this stage even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones. See Bush v. Vera, 517 U.S. 952, 968-970, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (holding that race predominated when a legislature deliberately "spread[ ] the Black population" among several districts in an effort to "protect[ ] Democratic incumbents"); Miller v. Johnson, 515 U.S. 900, 914, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (stating that the "use of race as a proxy" for "political interest[s]" is "prohibit[ed]").

Challenges to the constitutionality of congressional districts are heard by three-judge district courts, with a right of direct appeal to this Court. See 28 U.S.C. §§ 2284(a), 1253.

The State's argument to the contrary rests on a legal proposition that was foreclosed almost as soon as it was raised in this Court. According to the State, racial considerations cannot predominate in drawing district lines unless there is an "actual conflict" between those lines and "traditional districting principles." Brief for Appellants 45. But we rejected that view earlier this Term, holding that when (as here) race furnished "the overriding reason for choosing one map over others," a further showing of "inconsistency between the enacted plan and traditional redistricting criteria" is unnecessary to a finding of racial predominance. Bethune-Hill v. Virginia State Bd. of Elections, 580 U.S. ----, ----, 137 S.Ct. 788, 799, 197 L.Ed.2d 85 (2017). And in any event, the evidence recounted in the text indicates that District 1's boundaries did conflict with traditional districting principles-for example, by splitting numerous counties and precincts. See supra, at 1469. So we would uphold the District Court's finding of racial predominance even under the (incorrect) legal standard the State proposes.

In the District Court, the parties also presented arguments relating to the first Gingles prerequisite, contesting whether the African-American community in the region was sufficiently large and compact to form a majority of a reasonably shaped district. The court chose not to decide that fact-intensive question. And aside from the State's unelaborated assertion that "[t]here is no question that the first factor was satisfied," Brief for Appellants 52, the parties have not briefed or argued the issue before us. We therefore have no occasion to address it.

North Carolina calls our attention to two expert reports on voting patterns throughout the State, but neither casts light on the relevant issue. The first (by Dr. Thomas Brunell) showed that some elections in many of the State's counties exhibited "statistically significant" racially polarized voting. App. 1001. The second (by Dr. Ray Block) found that in various elections across the State, white voters were "noticeably" less likely than black voters to support black candidates. Id., at 959. From those far-flung data points-themselves based only on past elections-the experts opined (to no one's great surprise) that in North Carolina, as in most States, there are discernible, non-random relationships between race and voting. But as the District Court found, see Harris v. McCrory, 159 F.Supp.3d 600, 624 (M.D.N.C.2016), that generalized conclusion fails to meaningfully (or indeed, at all) address the relevant local question: whether, in a new version of District 1 created without a focus on race, black voters would encounter "sufficient [ ]" white bloc-voting to "cancel [their] ability to elect representatives of their choice," Gingles, 478 U.S., at 56, 106 S.Ct. 2752. And so the reports do not answer whether the legislature needed to boost District 1's BVAP to avoid potential § 2 liability.

Justice ALITO charges us with "ignor[ing]" the State's political-gerrymander defense, making our analysis "like Hamlet without the prince." Post, at 1496 (opinion concurring in judgment in part and dissenting in part) (hereinafter dissent); see post, at 1496, 1504. But we simply take the State's account for what it is: one side of a thoroughly two-sided case (and, as we will discuss, the side the District Court rejected, primarily on factual grounds). By contrast, the dissent consistently treats the State's version of events (what it calls "the Legislature's political strategy and the relationship between that strategy and [District 12's] racial composition," post, at 1496) as if it were a simple "fact of the matter"-the premise of, rather than a contested claim in, this case. See post, at 1492 - 1493, 1494, 1496, 1499 - 1500, 1500 - 1501, 1503. The dissent's narrative thus tracks, top-to-bottom and point-for-point, the testimony of Dr. Hofeller, the State's star witness at trial-so much so that the dissent could just have block-quoted that portion of the transcript and saved itself a fair bit of trouble. Compare post, at 1492 - 1496, with App. 2671-2755. Imagine (to update the dissent's theatrical reference) Inherit the Wind retold solely from the perspective of William Jennings Bryan, with nary a thought given to the competing viewpoint of Clarence Darrow.

As earlier noted, that inquiry is satisfied when legislators have "place[d] a significant number of voters within or without" a district predominantly because of their race, regardless of their ultimate objective in taking that step. See supra, at 1463 - 1464, and n. 1. So, for example, if legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests-perhaps thinking that a proposed district is more "sellable" as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing-their action still triggers strict scrutiny. See Vera, 517 U.S., at 968-970, 116 S.Ct. 1941 (plurality opinion). In other words, the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics. See Miller, 515 U.S., at 914, 115 S.Ct. 2475.

Undeterred by these settled principles, the dissent undertakes to refind the facts of this case at every turn. See post, at 1491 - 1503. Indeed, the dissent repeatedly flips the appropriate standard of review-arguing, for example, that the District Court's is not "the only plausible interpretation" of one piece of contested evidence and that the State offered an "entirely natural" view of another. Post, at 1498 - 1499, 1502; see also post, at 1496, 1499 - 1500, 1500, 1503. Underlying that approach to the District Court's factfinding is an elemental error: The dissent mistakes the rule that a legislature's good faith should be presumed "until a claimant makes a showing sufficient to support th[e] allegation" of "race-based decisionmaking," Miller, 515 U.S., at 915, 115 S.Ct. 2475 for a kind of super-charged, pro-State presumption on appeal, trumping clear-error review. See post, at 1491 - 1492, n. 7.

The dissent's contrary reading of the preclearance submission-as reporting the redistricters' "decis[ion] not to construct District 12 as a majority-minority district," post, at 1498-is difficult to fathom. The language the dissent cites explains only why Rucho and Lewis rejected one particular way of creating such a district; the submission then relates their alternative (and, of course, successful) approach to attaining an over-50% BVAP. See App. 478-479.

Watt recalled that he laughed in response because the VRA required no such target. See id., at 2369. And he told Rucho that "the African-American community will laugh at you" too. Ibid. Watt explained to Rucho: "I'm getting 65 percent of the vote in a 40 percent black district. If you ramp my [BVAP] to over 50 percent, I'll probably get 80 percent of the vote, and[ ] that's not what the Voting Rights Act was designed to do." Ibid.

The court acknowledged that, in the earlier state-court trial involving District 12, Rucho denied making the comments that Watt recalled. See 159 F.Supp.3d, at 617-618. But the court explained that it could not "assess [the] credibility" of Rucho's contrary account because even though he was listed as a defense witness and present in the courtroom throughout the trial, the State chose not to put him on the witness stand. Id., at 618.

The dissent conjures a different way of explaining Watt's testimony. Perhaps, the dissent suggests, Rucho disclosed a majority-minority target to Watt, but Watt then changed Rucho's mind -and perhaps it was just a coincidence (or a mistake?) that Rucho still created a 50.7%- BVAP district. See post, at 1499 - 1500. But nothing in the record supports that hypothesis. See ibid. (relying exclusively on the State's preclearance submission to back up this story); supra, at 1475 - 1476, and n. 9 (correcting the dissent's misreading of that submission). And the State, lacking the dissent's creativity, did not think to present it at trial.

The dissent charges that this comparison is misleading, but offers no good reason why that is so. See post, at 1501 - 1502. It is quite true, as the dissent notes, that another part of District 12 (in Mecklenburg County) experienced a net increase in black voters even larger than the one in Guilford County. See post, at 1501 - 1502. (The net increases in the two counties thus totaled more than 35,000; they were then partially offset by net decreases in other counties in District 12.) But that is irrelevant to the point made here: Without the numerous black voters added to District 12 in Guilford County-where the evidence most clearly indicates voters were chosen based on race-the district would have fallen well shy of majority-minority status.

Hofeller did not dispute Ansolabehere's figures, but questioned his inference. Those striking patterns, the mapmaker claimed, were nothing more than the result of his own reliance on voting data from the 2008 Presidential election-because that information (i.e., who voted for Obama and who for McCain) tracked race better than it did party registration. See App. 1101, 1111-1114; cf. Cromartie II, 532 U.S. 234, 245, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (recognizing that "party registration and party preference do not always correspond"). As we have just recounted, however, the District Court had other reasons to disbelieve Hofeller's testimony that he used solely that electoral data to draw District 12's lines. See supra, at 1476 - 1477. And Ansolabehere contended that even if Hofeller did so, that choice of data could itself suggest an intent to sort voters by race. Voting results from a "single [Presidential] election with a Black candidate," Ansolabehere explained, would be a "problematic and unusual" indicator of future party preference, because of the racial dynamics peculiar to such a match-up. App. 341; see id., at 342-343. That data would, indeed, be much more useful as a reflection of an area's racial composition: "The Obama vote," Ansolabehere found, is "an extremely strong positive indicator of the location of Black registered voters" and, conversely, an "extremely strong negative indicator of the location of White registered voters." Id., at 342; see id., at 2546-2550.

The dissent responds that an alternative-map requirement "should not be too hard" for plaintiffs (or at least "sophisticated" litigants "like those in the present case") to meet. Post, at 1491 - 1492. But if the plaintiffs have already proved by a preponderance of the evidence that race predominated in drawing district lines, then we have no warrant to demand that they jump through additional evidentiary hoops (whether the exercise would cost a hundred dollars or a million, a week's more time or a year's). Or at least that would be so if we followed the usual rules. Underlying the dissent's view that we should not-that we should instead create a special evidentiary burden-is its belief that "litigation of this sort" often seeks to "obtain in court what [a political party] could not achieve in the political arena," post, at 1490, and so that little is lost by making suits like this one as hard as possible. But whatever the possible motivations for bringing such suits (and the dissent says it is not questioning "what occurred here," ibid. ), they serve to prevent legislatures from taking unconstitutional districting action-which happens more often than the dissent must suppose. State lawmakers sometimes misunderstand the VRA's requirements (as may have occurred here with respect to § 5), leading them to employ race as a predominant districting criterion when they should not. See supra, at 1475 - 1476, and n. 10. Or they may resort to race-based districting for ultimately political reasons, leveraging the strong correlation between race and voting behavior to advance their partisan interests. See nn. 1, 7, supra. Or, finally-though we hope less commonly-they may simply seek to suppress the electoral power of minority voters. When plaintiffs meet their burden of showing that such conduct has occurred, there is no basis for subjecting them to additional-and unique-evidentiary hurdles, preventing them from receiving the remedy to which they are entitled.