[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15208
_____

D.C. Docket No. 2:15-cv-00497-MHT-TFM

WEST ALABAMA WOMEN'S CENTER,
on behalf of themselves and their patients,
WILLIAM J. PARKER, M.D.,
on behalf of himself and his patients,
ALABAMA WOMEN'S CENTER,
YASHICA ROBINSON WHITE, M.D.,

Plaintiffs-Appellees,

versus

DONALD E. WILLIAMSON,
in his official capacity as State Health Officer, et al.,

Defendants,

THOMAS M. MILLER, M.D.,
in his official capacity as State Health Officer,
ATTORNEY GENERAL, STATE OF ALABAMA,
LYN HEAD,
in her official capacity as District Attorney for Tuscaloosa County,
ROBERT L. BROUSSARD,
in his official capacity as District Attorney for Madison County,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(August 22, 2018)

Before ED CARNES, Chief Judge, DUBINA, Circuit Judge, and ABRAMS,[*] District Judge.

ED CARNES, Chief Judge:

Some Supreme Court Justices have been of the view that there is constitutional law and then there is the aberration of constitutional law relating to abortion.[1]  If so, what we must apply here is the aberration.

---

[*] Honorable Leslie J. Abrams, United States District Judge for the Middle District of Georgia, sitting by designation.

[1] See, e.g., Whole Woman's Health v. Hellerstedt, 579 U.S. __, 136 S. Ct. 2292, 2321 (2016) (Thomas, J., dissenting) (referring to "the Court's habit of applying different rules to different constitutional rights — especially the putative right to abortion"); Stenberg v. Carhart, 530 U.S. 914, 954, 120 S. Ct. 2597, 2621 (2000) (Scalia, J., dissenting) (stating that the "jurisprudential novelty" in that case "must be chalked up to the Court's inclination to bend the rules when any effort to limit abortion, or even to speak in opposition to abortion, is at issue"); Hill v. Colorado, 530 U.S. 703, 742, 120 S. Ct. 2480, 2503 (2000) (Scalia, J., dissenting) ("Because, like the rest of our abortion jurisprudence, today's decision is in stark contradiction of the constitutional principles we apply in all other contexts, I dissent."); Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 814, 106 S. Ct. 2169, 2206 (1986) (O'Connor, J., dissenting) ("This Court's abortion decisions have already worked a major distortion in the Court's constitutional jurisprudence."); id. ("Today's decision . . . makes it painfully clear that no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion.").

2

## I. BACKGROUND

### A. The Act

This case involves a method of abortion that is clinically referred to as Dilation and Evacuation (D & E). Or dismemberment abortion, as the State less clinically calls it. That name is more accurate because the method involves tearing apart and extracting piece-by-piece from the uterus what was until then a living unborn child. This is usually done during the 15 to 18 week stage of development, at which time the unborn child's heart is already beating.[2]

At that stage of pregnancy, it is settled under existing Supreme Court decisions that the State of Alabama cannot forbid this method of abortion entirely. See Stenberg, 530 U.S at 945–46, 120 S. Ct. at 2617. Recognizing that, the State has instead sought to make the procedure more humane by enacting the Alabama Unborn Child Protection from Dismemberment Abortion Act, which forbids dismembering a living unborn child. See Ala. Code § 26-23G-2(3).

Under the Act, the one performing the abortion is required to kill the unborn child before ripping apart its body during the extraction. See id. Killing an unborn child and then dismembering it is permitted; killing an unborn child by

---

[2] Like the district court and the parties, our references to the age of the unborn child measure the stage of a pregnancy by "gestational age." It starts counting on the first day of the mother's last menstrual period, as opposed to "post-fertilization age," which starts counting weeks after that. (Fertilization happens midway through the menstrual cycle.) All numbers and statistics have been adjusted accordingly.

3

dismembering it is not.  The parties agree that for these purposes an unborn child is alive while its heart is beating, which usually begins around six weeks.  See How Your Fetus Grows During Pregnancy, Am. Coll. of Obstetricians & Gynecologists (April 2018), http://www.acog.org/patients/faqs/ how-your-fetus-grows-during-pregnancy.  The Act does have an exception permitting the dismemberment of a living unborn child if "necessary to prevent serious health risk to the unborn child's mother."  Ala. Code § 26-23G-3(a).  Dismemberment abortions of a living unborn child that do not fit within that exception are crimes punishable by up to two years imprisonment and fines of $10,000.  Id. § 26-23G-7.

## B.  Procedural History

The plaintiffs are the West Alabama Women's Center, the Alabama Women's Center, and the medical directors of both clinics.[3]  In 2016 the plaintiffs sued on behalf of themselves and their present and future patients, claiming that the Act was unconstitutional on its face.[4]

---

[3] The West Alabama Women's Center is in Tuscaloosa and is the only abortion clinic in West Alabama.  It performed about 58% of Alabama abortions in 2014.  The Alabama Women's Center is the only abortion clinic in Huntsville, Alabama, and it performed about 14% of Alabama abortions in 2014. Those two clinics are the only two in Alabama that perform dismemberment abortions.

[4] Their complaint also challenged a zoning law that forbade the Alabama Department of Public Health from issuing or renewing medical licenses to abortion clinics located within 2,000 feet of a school.  That claim is not at issue in this appeal.

They then moved for a preliminary injunction barring enforcement of the Act. After holding an evidentiary hearing the district court entered an order preliminarily enjoining enforcement of the Act. In the course of doing so, the court issued an opinion with findings that there are no safe and effective ways for abortion practitioners to comply with the Act by killing the unborn child before dismembering it.

The State appealed the district court's order. Briefs were filed, the attorneys and three judges prepared for oral argument, but on the very eve of it, the district court issued a permanent injunction and replaced its previous opinion with a longer one. Because of that we had to dismiss as moot the State's appeal from the preliminary injunction. See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 314, 119 S. Ct. 1961, 1966 (1999) ("Generally, an appeal from the grant of a preliminary injunction becomes moot when the trial court enters a permanent injunction, because the former merges into the latter."). To keep things going, the State immediately filed an appeal from the judgment granting the permanent injunction; we issued a new briefing schedule and reset oral argument.

In its opinion accompanying the permanent injunction, the district court found that the Act would effectively eliminate pre-viability abortion access at or

5

after the 15-week mark because none of the State's proposed fetal demise methods were feasible. The court reasoned that the State's proffered interests — which it only assumed were legitimate — could not justify placing what it found to be "substantial, and even insurmountable, obstacles before Alabama women seeking pre-viability abortions." As a result, the court ruled that the Act "constitutes an undue burden on abortion access and is unconstitutional," and it granted as-applied injunctive relief to the plaintiffs. This is the State's appeal.

## II. STANDARDS OF REVIEW

"We review a district court's decision to grant a permanent injunction for an abuse of discretion." Estate of Brennan ex rel. Britton v. Church of Scientology Flag Serv. Org., Inc., 645 F.3d 1267, 1272 (11th Cir. 2011). The district court's conclusions of law we review de novo. Id. Its findings of fact we review for clear error. Id. "A finding of fact is clearly erroneous [only] if, upon reviewing the evidence as a whole, we are left with the definite and firm conviction that a mistake has been committed." U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC, 749 F.3d 967, 974 (11th Cir. 2014) (quotation marks omitted). And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S. Ct. 1504, 1511 (1985). The grip of

the clearly erroneous standard is even tighter when the district court hears testimony, giving it the opportunity to observe the demeanor of witnesses. See id. at 575, 105 S. Ct. at 1512 (findings based on the credibility of live witnesses are entitled to "even greater deference" because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").

The State tries to slip the grip of that narrow standard by contending that most of the facts here are not "adjudicative facts" to which the clear error standard applies but "legislative facts" that we decide de novo. But they aren't. "Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case." United States v. Bowers, 660 F.2d 527, 531 (5th Cir. Unit B 1981) (quotation marks omitted).

We have recognized a distinction between legislative facts and adjudicative facts in two contexts, neither of which exists here. First, in the area of administrative law, legislative facts can be found in a rulemaking proceeding, while adjudicative facts must be found on a case by case basis through hearings. See, e.g., Broz v. Heckler, 721 F.2d 1297, 1299 (11th Cir. 1983) (holding that the effect of a claimant's age on his ability to work was an adjudicative fact to be

7

determined on a case by case basis).  Second, in criminal cases, when a district

court takes judicial notice of an adjudicative fact Federal Rule of Evidence 201(f)

requires that the court instruct the jury "that it may or may not accept the noticed

fact as conclusive."  Fed. R. Evid. 201(f); see also Bowers, 660 F.2d at 531.  Not

so with a legislative fact.

The State has not cited, nor have we found, any authority suggesting that the

facts on which this case turns are legislative instead of adjudicative.[5]  So the clear

error standard applies when we get to the facts, but we will begin our discussion

with the applicable abortion law.

## III. DISCUSSION

### A. Abortion Law

The Supreme Court has interpreted the Fourteenth Amendment to bestow on

women a fundamental constitutional right of access to abortions.  See Roe v.

Wade, 410 U.S. 113, 153–54, 93 S. Ct. 705, 727 (1973).  About twenty years after

---

[5] Unable to find support in the law of this circuit, the State cites some opinions from our sister circuits noting that a reviewing court should consider facts found by a legislature in the exercise of its lawmaking power.  Those cases involved federal laws supported by findings in the Congressional Record.  See United States v. Singleterry, 29 F.3d 733, 740 (1st Cir. 1994) (finding that the Congressional Record provided sufficient information to uphold the distinction between cocaine base and cocaine in the federal sentencing scheme); Nat'l Abortion Fed. v. Gonzales, 437 F.3d 278, 302 (2d Cir. 2006) (Straub, J., dissenting), vacated, 224 F. App'x 88 (2d Cir. 2007) (The court should defer to "legislative facts found by a legislature in the exercise of its lawmaking power.").  By contrast, this case involves a state law unaccompanied by legislative findings.  See Ala. Code § 26-23G-2(3).

a majority of the Court had discovered that right lurking somewhere in the

"penumbras of the Bill of Rights" as illuminated by the "concept of ordered

liberty," id. at 152, 93 S. Ct. at 726, a majority of the Court devised an "undue

burden" test to go with it, see Planned Parenthood of Se. Pa. v. Casey, 505 U.S.

833, 964, 112 S. Ct. 2791, 2866 (1992) (Rehnquist, C.J., dissenting) ("The end

result of the joint opinion's paeans of praise for legitimacy is the enunciation of a

brand new standard for evaluating state regulation of a woman's right to abortion

— the 'undue burden' standard.").  The Court's most recent articulation of that test

goes like this:

> [T]here exists an undue burden on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the purpose or effect of the provision is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.

Whole Woman's Health, 136 S. Ct. at 2300 (quotation marks omitted).

Over the past couple of decades the Supreme Court has issued several

decisions drawing and redrawing the contours of the undue burden standard.  Three

of those decisions bear on the outcome of this case.  First, in Stenberg, the Court

struck down a Nebraska law that banned partial birth abortion.[6]  530 U.S. at 946,

---

[6] To perform a partial birth abortion, also known as "intact D & E," the abortion practitioner begins delivering the fetus "in a way conducive to pulling out its entire body, instead of ripping it apart."  Gonzales v. Carhart, 550 U.S. 124, 137, 127 S. Ct. 1610, 1622 (2007).  Once the practitioner has delivered the unborn child to a certain anatomical point inside the woman,

9

120 S. Ct. at 2617.  The Court found two fatal flaws in that law:  (1) it could be construed to ban not only partial birth abortion, but also dismemberment abortion, which is "the most commonly used method for performing previability second trimester abortions," id. at 945–46, 120 S. Ct. at 2617; and (2) it had no exception allowing partial birth abortion to preserve the health of the mother, id. at 930, 120 S. Ct. at 2609.

Seven years later the Court upheld a federal ban on partial birth abortion. Gonzales, 550 U.S. at 133, 127 S. Ct. at 1619.  In light of Stenberg the government conceded that the ban would be invalid if it covered dismemberment abortions.  Id. at 147, 127 S. Ct. at 1627.  But unlike the law at issue in Stenberg, the Court did not construe the federal ban to forbid dismemberment abortions.  Id. at 150, 127 S. Ct. at 1629.  Because the federal ban advanced legitimate interests and also permitted dismemberment abortions, the Court held that it did not impose an undue burden on a woman's right to choose an abortion.  Id. at 160, 164, 127 S. Ct. at 1634–35, 1637; see also id. at 158, 127 S. Ct. at 1633 ("Where it has a rational basis to act, and it does not impose an undue burden, the State may use its

---

however, he uses an instrument to kill it.  For instance, he may crush the unborn child's skull, or instead he may make an incision in the skull and vacuum out the brain matter.  Id. at 138–40, 127 S. Ct. at 1621–23.  Then the remains are delivered, generally in one piece (hence the term "intact D & E").  Id. at 137, 127 S. Ct. at 1622.

10

regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn.").

The Gonzales Court upheld the federal ban despite its lack of an exception permitting partial birth abortion if necessary to preserve the health of the mother, which was one of the fatal flaws afflicting the Nebraska law in Stenberg.  Compare id. at 161, 127 S. Ct. at 1635, with Stenberg, 530 U.S. at 930, 120 S. Ct. at 2609. The Court explained that the ban would have been invalid if it subjected women to "significant health risks."  Gonzales, 550 U.S. at 161, 127 S. Ct. at 1635.  But there was medical disagreement about whether, given the continuing availability of dismemberment abortions, the federal ban on partial birth abortions "would ever impose significant health risks on women." And lawmakers have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." Id. The Court reasoned that:

> Medical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts. The medical uncertainty over whether the [federal ban] creates significant health risks provides a sufficient basis to conclude in this facial attack that the [federal ban] does not impose an undue burden.

Id. at 162–64, 127 S. Ct. at 1636–37 (citation omitted).

11

Most recently, in Whole Woman's Health, the Court struck down two Texas regulations that required abortion practitioners to have certain qualifications and abortion clinics to have meet certain physical requirements.  136 S. Ct. at 2300. The Fifth Circuit had reversed the district court for "substituting its own judgment for that of the legislature when it conducted its undue burden inquiry, in part because medical uncertainty underlying a statute is for resolution by legislatures, not the courts."  Id. at 2309 (quotation marks omitted).  The Supreme Court responded:

> The statement that legislatures, and not courts, must resolve questions of medical uncertainty is . . . inconsistent with [the Supreme] Court's case law.  Instead, the Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings. In Casey, for example, we relied heavily on the District Court's factual findings and the research-based submissions of amici in declaring a portion of the law at issue unconstitutional.

Id. at 2310.  After declining to defer to the Texas legislature, the Court struck down the regulations because they "provide[ ] few, if any, health benefits for women, pose[ ] a substantial obstacle to women seeking abortions, and constitute[ ] an 'undue burden' on their constitutional right to do so."  Id. at 2318.

## B. The State's Interest

One requirement that Casey and its progeny establish, which is carried in the "purpose or effect" language of the opinions, is that a state regulation that applies

12

to pre-viability stage abortions must have a legitimate or valid purpose other than simply reducing the number of abortions. See id. at 2300. The district court did not decide whether the State had a legitimate interest in requiring that the unborn child be humanely killed before it is torn apart. It only assumed the State did. But, to borrow Holmes' words from another setting, "[t]his is not a matter for polite assumptions; we must look facts in the face." Frank v. Mangum, 237 U.S. 309, 349, 35 S. Ct. 582, 595 (1915) (Holmes, J., dissenting).

The facts that show the State's interests furthered by the Act are those that describe what the method of abortion involves. See Gonzales, 550 U.S. at 156, 127 S. Ct. at 1632 ("A description of the prohibited abortion procedure demonstrates the rationale for the [prohibition]."). So we will look those facts in the face, setting them out in language that does not obscure matters for people who, like us, are untrained in medical terminology. See Stenberg, 530 U.S. at 957–58, 120 S. Ct. at 2623 (Kennedy, J., dissenting) ("Repeated references to sources understandable only to a trained physician may obscure matters for persons not trained in medical terminology. Thus it seems necessary at the outset to set forth what may happen during an abortion.").

As Justice Kennedy has described this method of ending a pregnancy, dismemberment abortion "requires the abortionist to use instruments to grasp a

13

portion (such as a foot or hand) of a developed and living fetus and drag the grasped portion out of the uterus into the vagina."[7] Id. at 958, 120 S. Ct. at 2624. The practitioner then "uses the traction created by the opening between the uterus and vagina to dismember the fetus, tearing the grasped portion away from the remainder of the body." Id. That is not the result of any sadistic impulses of the practitioner but instead is part and parcel of the method. See id. One practitioner explained:

---

[7] A word about words. The State uses the term "abortionist" to refer to those who perform abortions. That term does appear in several opinions of Supreme Court Justices. See, e.g., Johnson v. United States, 576 U.S. __, 135 S. Ct. 2551, 2571 (2015) (Thomas, J., concurring); Stenberg, 530 U.S. at 953–54, 120 S. Ct. at 2621 (Scalia, J., dissenting); id. at 957–60, 964–65, 968, 974–76, 120 S. Ct. at 2623–24, 2627, 2629, 2632–33 (Kennedy, J., dissenting, joined by Rehnquist, C.J.); Colautti v. Franklin, 439 U.S. 379, 403, 407–09, 99 S. Ct. 675, 689, 691–92 (1979) (White, J., dissenting, joined by Burger, C.J., and Rehnquist, J.). Some people, however, consider the term pejorative. See, e.g., Warren M. Hern, "Abortionist" Carries a Charged Meaning, N.Y. Times, Sept. 7, 1993 ("The term abortionist has been used most often to describe illegal actors in a sleazy world of avaricious, incompetent criminals exploiting immoral women in a sordid and hazardous procedure.").

The plaintiffs refer to those who perform abortions as "physicians" and "doctors." Those terms also appear in several Supreme Court abortion decisions. See, e.g., Whole Woman's Health, 136 S. Ct. at 2301 (referring to persons who perform abortions as "physicians"); Gonzales, 550 U.S. at 133–35, 139, 127 S. Ct. at 1619–21, 1623 ("physicians" and "doctors"); Stenberg, 530 U.S. at 922, 937–38, 120 S. Ct. at 2605, 2612–13 (same). Some people, however, view those terms as inapposite, if not oxymoronic, in the abortion context. See, e.g., Is "Abortion Doctor" Pejorative? Cont'd, Nat'l Rev., Apr. 22, 2007 ("The truth is that persons performing what we ordinarily think of when we use the term 'abortions' are not acting as doctors (i.e., healers) at all. Whether or not they hold a medical degree and license to practice medicine, the object of their action is not healing but killing.") (quoting Letter from Robert P. George, Professor of Jurisprudence, Princeton University, to Jonah Goldberg, Senior Editor, Nat'l Rev., Apr. 22, 2007).

We will take a middle course and use the term "practitioner," except where one of the other terms appears in a quotation.

14

> The traction between the uterus and vagina is essential to the procedure because attempting to abort a fetus without using that traction is [like] "pulling the cat's tail" or "drag[ging] a string across the floor, you'll just keep dragging it.  It's not until something grabs the other end that you are going to develop traction."

Id.

In this type of abortion the unborn child dies the way anyone else would if dismembered alive.  "It bleeds to death as it is torn limb from limb."  Id. at 958–59, 120 S. Ct. at 2624.  It can, however, "survive for a time while its limbs are being torn off."  Id. at 959, 120 S. Ct. at 2624.  The plaintiff practitioner in the Stenberg case testified that using ultrasound he had observed a heartbeat even with "extensive parts of the fetus removed."  Id.  But the heartbeat cannot last.  At the end of the abortion — after the larger pieces of the unborn child have been torn off with forceps and the remaining pieces sucked out with a vacuum — the "abortionist is left with 'a tray full of pieces.'"  Id.  It is no wonder that Justice Ginsburg has described this method of abortion as "gruesome" and "brutal." Gonzales, 550 U.S. at 182, 127 S. Ct. at 1647 (Ginsburg, J., dissenting) (comparing this method to partial birth abortion and stating that this one "could equally be characterized as brutal, involving as it does tearing a fetus apart and ripping off its limbs," describing it as "equally gruesome," and arguing that it is no less "akin to infanticide" than partial birth abortion) (quotation marks omitted).

15

Having looked the facts in the face and described dismemberment abortion for what it is, we recognize at least three legitimate interests that animate the State's effort to prevent an unborn child from being dismembered while its heart is beating. First, the State "may use its voice and its regulatory authority to show its profound respect for the life within the woman." Id. at 157, 127 S. Ct. at 1633; see also Casey, 505 U.S. at 877, 112 S. Ct. at 2821 (recognizing as a legitimate interest the State's "profound respect for the life of the unborn"). Second, it may regulate a "brutal and inhumane procedure" to avoid "coarsen[ing] society to the humanity of not only newborns, but all vulnerable and innocent human life." Gonzales, 550 U.S. at 157, 127 S. Ct. at 1633 (quotation marks omitted). And third, it may enact laws to protect the integrity of the medical profession, including the health and well-being of practitioners. See id. at 157, 160, 127 S. Ct. at 1633–34. Dismemberment abortions exact emotional and psychological harm on at least some of those who participate in the procedure or are present during it. See Br. of Am. Assoc. of Pro-Life Obstetricians & Gynecologists at 20–24.[8]

_____

[8] The amici debate whether an unborn child can feel pain at the gestational stage at which dismemberment abortions are performed. Compare Br. of Am. Coll. of Obstetricians & Gynecologists at 15 n.36 ("Rigorous scientific studies have found that the . . . brain structures necessary to process [pain] do not develop until at least 24 weeks of gestation.") (quotation marks omitted), with Br. of Am. Assoc. of Pro-Life Obstetricians & Gynecologists at 5 ("Researchers have found that unborn children can experience pain in some capacity from as early as eight weeks of development."). The plaintiffs' expert testified that "fetal pain" is a "biological impossibility" at that early stage, and the State did not argue to the district court that the Act is designed to avoid inflicting pain on the unborn child. So we won't weigh in on that

16

The State has an actual and substantial interest in lessening, as much as it can, the gruesomeness and brutality of dismemberment abortions.  That interest is so obvious that the plaintiffs do not contest it.  But the fact that the Act furthers legitimate state interests does not end the constitutional inquiry.  The legitimacy of the interest is necessary but not sufficient for a pre-viability abortion restriction to pass the undue burden test.  See Whole Woman's Health, 136 S. Ct. at 2309 ("[A] statute which, while furthering [the interest in potential life or some other] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.") (citing Casey, 505 U.S. at 877, 112 S. Ct. at 2820 (plurality opinion)); see also Gonzales, 550 U.S. at 161, 127 S. Ct. at 1635 ("The Act's furtherance of legitimate government interests bears upon, but does not resolve, . . . whether the Act has the effect of imposing an unconstitutional burden on the abortion right . . . .").

## C. The District Court's Factfindings

The dispositive question is whether by prohibiting the dismemberment of a living unborn child the Act imposes an undue burden on a woman's right to

issue.  See Richardson v. Ala. State Bd. of Educ., 935 F.2d 1240, 1247 (11th Cir. 1991) (noting that absent "exceptional circumstances, amici curiae may not expand the scope of an appeal to implicate issues not presented by the parties to the district court").

terminate a pre-viability pregnancy.  See Whole Woman's Health, 136 S. Ct. at 2300.  The State says the Act does not unduly burden that right because there are methods by which abortion practitioners can kill an unborn child before dismembering it without impeding a woman's access to an abortion.  Before discussing the State's proposed methods of fetal demise,[9] we will recount some facts about abortion providers and women who seek their services because those facts bear on the feasibility of the State's proposed methods.

### 1. Abortions in Alabama

The district court found that 99.6% of abortions in Alabama occur in outpatient clinics.[10]  That matters because outpatient clinics lack resources that hospitals possess — like anesthesia staffing, operating rooms, and blood banks — which means some procedures that are feasible in a hospital setting may not be in an outpatient clinic.

Nearly 93% of abortions performed in Alabama occur before 15 weeks, at which time dismemberment abortion is unnecessary because the unborn child is small enough for practitioners to use other methods that the Act does not prohibit.

---

[9] Another word about words.  The district court and the parties use the phrase "causing fetal demise" to mean killing an unborn child.  We will follow their lead on that for the sake of consistency.

[10] The district court and the parties relied mainly on abortion statistics from 2014, apparently because those were the most recent ones available, and nothing in the record suggests that those statistics have changed materially in recent years.

For the 7% of abortions that occur after 15 weeks, 99% of them are by dismemberment.  That's because at that later stage of pregnancy dismemberment abortion is simpler and safer than other methods, with major complications arising less than 1% of the time.  Of those post-15 week dismemberment abortions, one year hospitals performed 7 and clinics performed about 500.  Those 500 dismemberment abortions occurred at only two clinics:  the West Alabama Women's Center and the Alabama Women's Center.  So the plaintiffs are the only clinics in Alabama that perform abortions at or after the 15-week mark.

The district court also found that a majority of Alabama women who seek abortions at the plaintiff clinics are low income.  Sixty percent of patients at the Alabama Women's Center receive income-based financial assistance.  Patients at the West Alabama Women's Center are also indigent:  82% live at or below 110% of the federal poverty level.  Those facts matter, the district court reasoned, because the State's proposed methods for killing the unborn child before dismemberment prolong the abortion.  Low-income patients, the court reasoned, may not have the financial means to make several trips to a clinic or stay in its vicinity for an extended period of time.

19

2. The State's Proposed Fetal Demise Methods

With those background facts in mind, we turn to the State's proposed fetal demise methods. The State contends that practitioners can cause fetal demise without much difficulty, so the Act does not effectively prohibit dismemberment abortions and thereby impose an undue burden on women seeking abortions. But the State conceded at oral argument: "[I]f there [is] no safe and effective way to cause fetal demise before [dismemberment,] . . . this law would be unconstitutional." See Crowe v. Coleman, 113 F.3d 1536, 1542 (11th Cir. 1997) ("That concessions and admissions of counsel at oral argument in appellate courts can count against them is doubtlessly true."). As a result, this case turns on whether the fetal demise methods are feasible, which in this context means safe, effective, and available. The State proposes three methods: (1) injecting potassium chloride into the unborn child's heart; (2) cutting the umbilical cord in utero; and (3) injecting digoxin into the amniotic fluid. The district court found each to be infeasible.

a. *Potassium chloride injections*

The State's first proposed method is the most technically challenging to administer. Potassium chloride injections involve using a sonogram (the image an ultrasound machine makes) to guide a long spinal needle through the patient's

abdomen, into her uterus, through the amniotic fluid, and into the fetus' heart, which at 15 weeks is "smaller than a dime."

The district court found that potassium chloride injections were not feasible for three reasons. First, the injection requires great technical skill, and abortion practitioners in Alabama have no practical way to learn how to perform it safely. The only practitioners trained to perform potassium chloride injections are maternal-fetal medicine fellows pursuing a subspecialty in high risk pregnancy. Even those highly trained subspecialists rarely get the chance to practice the procedure — the State's witness testified that the hospital where he practices performs fewer than 10 injections per year. And another expert testified that a practitioner must perform at least 100 potassium chloride injections to become competent at it.

Second, many of the plaintiffs' patients have anatomical problems that make potassium chloride even harder to inject. For example, fibroids, or "benign growths in the uterus," can block the needle from reaching the fetus. Other factors, like obesity, can also cause complications. More than 50% of the plaintiffs' patients have fibroids and more than 40% are obese.

Finally, the district court reasoned that a potassium chloride injection introduces health risks into the otherwise safe (for the woman) dismemberment

21

abortion procedure.  A botched injection into a patient's blood vessels can cause cardiac arrest.  The injection also increases the risk of puncturing or infecting the uterus.  For those reasons, the district court held that potassium chloride injections were not a feasible method of complying with the Act.

### b. *Umbilical cord transection*

The State's next proposed fetal demise method, umbilical cord transection, involves dilating a patient's cervix and cutting the umbilical cord.  After inducing dilation, the abortion practitioner would use a sonogram to locate the cord, insert a surgical instrument into the uterus, and cut the cord.  The practitioner would then wait for the unborn child's heartbeat to stop, which can take more than 10 minutes, before he could begin dismembering it.

The district court found that umbilical cord transection is not feasible for three reasons.  First, the procedure is technically challenging.  On a sonogram, amniotic fluid contrasts with the unborn child and the umbilical cord, making it easy to distinguish the contents of the uterus.  But before he can cut the cord the practitioner must puncture the amniotic sac, which causes the fluid to drain and obscures visualization into the uterus.  Drainage also causes the uterus to contract, which compresses the cord and the unborn child.  That poses another hurdle for the practitioner because if he cuts fetal tissue instead of, or in addition to the cord, he

22

has arguably performed the conduct that the Act prohibits. See Ala. Code § 26-23G-2(3). The result is that a practitioner must find and cut a cord that is the width of a piece of yarn without being able to see or physically touch it and without cutting any surrounding fetal tissue, lest he violate the Act.

Second, the district court found that cord transection carries serious health risks, including blood loss, infection, and uterine injury. Cutting the cord increases the risk of hemorrhage compared to a routine dismemberment abortion, especially considering that it can take over 10 minutes for the heart to stop before the dismemberment can begin. While the abortion practitioner waits for the unborn child's heart to stop, the patient may undergo uterine contractions and hemorrhage. The risks are worse in the outpatient setting because clinics lack access to blood banks. The plaintiff clinics also possess less sophisticated ultrasound machines than hospitals, which makes it harder for them to locate the cord.

Third, there is no available training in Alabama to teach the cord transection procedure to practitioners. The plaintiffs have no training in it, and there are few opportunities to observe others performing the procedure. Given the climate of hostility toward abortions in Alabama, it is unlikely that the plaintiff-clinics could attract practitioners already trained in the procedure. For those reasons, the district

23

court found that umbilical cord transection was not a feasible method of complying with the Act.

c. *Digoxin injections*

The State's last proposed method of fetal demise — digoxin — poses less of a technical challenge than the other methods because it can be injected into the amniotic fluid, which is a bigger target than a fetal heart.  Although digoxin isn't too difficult to administer, the district court found that it too was not feasible, for five reasons.  First, unlike the other methods, digoxin fails to kill the unborn child between 10% and 15% of the time.  If the first dose fails, the Act would require an abortion practitioner to either inject a second dose or try an alternative method of fetal demise.  See Ala. Code § 26-23G-2(3).  Because there is no medical literature on the proper dosage for a second digoxin injection or the potential risks of one, successive injections would subject a woman seeking a dismemberment abortion to what the district court characterized as an experimental medical procedure.

Second, digoxin injections can be obstructed by the same anatomical obstacles that impede potassium chloride injections, like fibroids and obesity.  Third, digoxin injections are untested during the stage at which most Alabama women receive dismemberment abortions.  The bulk of digoxin research considers its effect on pregnancies at or after 18 weeks; a few studies include cases at 17

24

weeks; and none have researched the efficacy, dosage, or safety of digoxin on women before 17 weeks. Yet 80% of dismemberment abortions are performed between 15 to 18 weeks, at which time the effect and dosage of digoxin is largely unstudied. So administering digoxin to most women who seek a post-15 week abortion could be considered experimental.

Fourth, digoxin injections carry health risks. The injections increase the odds of infection, hospitalization, and what the profession calls "extramural delivery," meaning delivery outside the clinic. Extramural delivery is dangerous because the patient lacks medical attention in case of complications (like hemorrhage), and may be alone.

Finally, the district court found that using digoxin injections would create logistical hurdles to abortion access. A digoxin injection would increase the duration of a dismemberment abortion from one day to two, not counting the 48-hour waiting period mandated by Alabama law. All told, a woman seeking a second trimester abortion would have to meet with her doctor at least three times over four days, before the 15-minute procedure was performed. That burden, the district court found, would be heavier for the plaintiffs' patients, who are mostly low income. For those reasons, the district court held that digoxin was not a feasible method of causing fetal demise.

25

D. Applying the Undue Burden Test

In applying the undue burden test, we look at whether the three methods of fetal demise that the State has proposed are safe, effective, and available. If they are not, we look to whether the health exception saves the Act.

1. The State's Proposed Methods Are Not Safe, Effective, or Available

The district court decided that the State's proposed fetal demise methods were not safe, effective, and available, and for that reason it decided that the Act imposes an undue burden. We begin with its findings about the safety of the proposed methods.

The State conceded at oral argument that the proposed methods would increase the risks associated with a dismemberment abortion.[11] But the State disputes whether those risks are "significant." See Gonzales, 550 U.S. at 161, 127 S. Ct. at 1635. The district court rejected that position and concluded that each of the fetal demise methods carry "significant health risks." It found that potassium chloride injections can cause uterine perforation and infection and cardiac arrest if introduced into the bloodstream. That umbilical cord transection raises the risk of hemorrhage and uterine infection and injury. And that digoxin injections increase the risk of hemorrhage, infection, and extramural delivery. And that all of those

---

[11] At oral argument, counsel for the State agreed that "there's no uncertainty that [requiring fetal demise] raises the risk some." Oral Argument at 14:30, http://www.ca11.uscourts.gov/oral-argument-recordings?title=17-15208.

risks are increased when fetal demise is attempted in an outpatient setting — where nearly all Alabama abortions take place — because clinics lack resources that are commonplace in hospitals.

The district court heard the testimony, including that of competing experts, and thoroughly explained its resolution of all the material conflicts in the evidence. We are not left with a "definite and firm conviction that a mistake has been committed" in any of the court's material findings. See Hunter Wise Commodities, LLC, 749 F.3d at 974 (quotation marks omitted). The State relies on some studies that it says constitute "ample documented medical support for the safety of the [fetal demise] procedures." But, as the district court pointed out, because those studies took place in hospitals, not outpatient clinics, they do not take into account the risks of attempting fetal demise in an outpatient setting. Not only that but the State's own expert admitted that two of the fetal demise methods posed serious health risks.[12] The State cannot win the factual battle.

Nor the legal one. The State contends that the district court made a legal error by weighing the evidence of those risks. It argues that, under Gonzales,

---

[12] The State's expert, Dr. Joseph Biggio, testified that digoxin injections would subject women to "an approximately 5–10% risk of spontaneous onset of labor, rupture of the membranes or development of intrauterine infection," and "small risks of bleeding, infection, and inadvertent penetration of the bowel or bladder with the needle." He also testified that potassium chloride subjects women to bleeding, sepsis, bowel or bladder injury, and cardiac arrest.

states may restrict an abortion method as long as there is medical uncertainty about whether the restriction creates significant health risks.  See Gonzales, 550 U.S. at 164, 127 S. Ct. at 1637.  The State asserts that it is up to states themselves, not the courts, to resolve any "medical uncertainty" about the significance of the risks that are created and to weigh those risks. And according to the State, its preferred studies create medical uncertainty by suggesting that the proposed fetal demise methods would not impose significant health risks.

The State's argument fails for three reasons.  First, the "medical uncertainty" sentence in Gonzales was pegged to facial relief, not to as-applied relief, which is what was granted in this case.  Id. ("The medical uncertainty over whether the [ban] creates significant health risks provides a sufficient basis to conclude in this facial attack that the [ban] does not impose an undue burden.") (emphasis added). The State asserts (without support) that here "the district court did not convert this [case] into an as-applied challenge when it purported to grant 'as-applied relief,'" but that is exactly what the district court did.  And the court had the authority to do that both because district courts enjoy discretion in crafting injunctive relief, Britton, 645 F.3d at 1272, and because the law favors as-applied relief, Gonzales, 550 U.S. at 168, 127 S. Ct. at 1639.  The district court did not err in granting as-

28

applied relief to the plaintiffs, and <u>Gonzales</u>' "medical uncertainty" dictum does not apply.[13]

The second reason that the State's medical uncertainty argument fails is that controlling precedent refutes it. <u>See</u> <u>Whole Woman's Health</u>, 136 S. Ct. at 2309–10 (rejecting the view that "legislatures, and not courts, must resolve questions of medical uncertainty" and noting that courts "retain[ ] an independent constitutional duty to review factual findings where constitutional rights are at stake") (emphasis, citation, and quotation marks omitted). The State and its amici argue that part of <u>Whole Woman's Health</u> does not control this case because the Court was considering health-based regulations instead of an abortion method ban. But the Court in <u>Whole Woman's Health</u> cited several abortion method ban cases to conclude the regulations at issue imposed an undue burden. <u>See</u> 136 S. Ct. at 2309–10. The State cites no support for the proposition that a different version of

---

[13] The State also argues that the district court should not have awarded as-applied relief because "clinics do not have a substantive due process right to an abortion; women do." Generally, a plaintiff cannot challenge a statute by asserting the rights of another. <u>United States v. Raines</u>, 362 U.S. 17, 21–22, 80 S. Ct. 519, 522–23 (1960). But not surprisingly — after all, we're dealing with abortion here, a most-favored constitutional right — the Court has been "especially forgiving of third-party standing criteria for one particular category of cases: those involving the purported substantive due process right of a woman to abort her unborn child." <u>Whole Woman's Health</u>, 136 S. Ct. at 2322 (Thomas, J., dissenting); <u>see also</u> <u>Singleton v. Wulff</u>, 428 U.S. 106, 116, 96 S. Ct. 2868, 2876 (1976) (plurality opinion) ("[I]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision . . . ."). Indeed, all the landmark abortion cases since <u>Roe v. Wade</u> have been brought by physicians or clinics. <u>See</u> <u>Whole Woman's Health</u>, 136 S. Ct. at 2301; <u>Gonzales</u>, 550 U.S. at 132–33, 127 S. Ct. at 1619; <u>Stenberg</u>, 530 U.S. at 922, 120 S. Ct. at 2605; <u>Casey</u>, 505 U.S. at 845, 112 S. Ct. at 2803. So the State's argument is meritless.

the undue burden test applies to a law regulating abortion facilities.  The question in all abortion cases is whether "the purpose or effect of the [law at issue] is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."  Id. at 2300 (quotation marks omitted).

The third reason that the State's medical uncertainty argument fails is that the uncertainty in Gonzales was about whether the federal partial birth abortion ban "would ever impose significant health risks on women" given the continuing availability of dismemberment abortion.  Gonzales, 550 U.S. at 162, 127 S. Ct. at 1636 (emphasis added).  By contrast, in this case the State conceded that by requiring pre-dismemberment death of the unborn child the Act would always impose some increased health risks on women.

The State's remaining arguments on this front are even less persuasive.  It argues that we need not worry about the risks attending umbilical cord transection because that method of fetal demise imposes "the same categories of risks that are already inherent in the standard [dismemberment] procedure."  Categories of risk are one thing, degree of risk is another.  The district court found as a fact that cutting the umbilical cord increases the degree of risk to the woman.  The State cites no support for the proposition that a state may subject women to an increased

30

degree of risk as long as it doesn't subject them to a new category of risk. There is none.

The State also argues that the Act does not impose an undue burden because it "is only relevant to a small percentage of abortions" as compared to all abortions performed in Alabama. It is true that 93% of Alabama abortions occur before 15 weeks, and for them dismemberment abortion is neither necessary nor used. But that fact is irrelevant because "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." Casey, 505 U.S. at 894, 112 S. Ct. at 2829; see also id. ("The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.").

As for the effect of the Act on the availability of pre-viability abortions in Alabama, the district court made additional findings. It noted that the Act's fetal demise requirement would increase by one day the time required from preparation to the actual dismemberment procedure, which would in turn increase the costs of travel and lodging for women who do not live near the plaintiff clinics. The court explained that this delay and extra cost would be especially burdensome for low-income women, who comprise a large proportion of the plaintiffs' patients.

31

Although that increased time and expense would not be enough by itself to invalidate the Act, see Gonzales, 550 U.S. at 157–58, 127 S. Ct. at 1633 ("[T]he fact that a law which serves a valid purpose . . . has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it."), it does support the conclusion that the Act would "place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability," Whole Woman's Health, 136 S. Ct. at 2300 (emphasis and quotation marks omitted).

Continuing on the subject of availability, the district court found that there were few if any opportunities for the plaintiff physicians to learn how to inject potassium chloride or cut the umbilical cord. For potassium chloride injections, the most challenging of the methods, the State's own expert conceded that he knew of no opportunities for the plaintiffs to learn it. The district court found that the plaintiff clinics could not easily attract out-of-state practitioners already trained in those procedures. Its finding that the lack of training opportunities coupled with the difficulties of recruiting trained practitioners renders potassium chloride and umbilical cord transection unavailable in Alabama clinics support the conclusion that the Act imposes an undue burden.[14]

---

[14] The State responds that practitioners who cannot perform the more difficult methods can instead try injecting digoxin. But the district court found that the effect of digoxin on

32

All of those findings about the fetal demise methods — their attendant risks; their technical difficulty; their untested nature; the time and cost associated with performing them; the lack of training opportunities; and the inability to recruit experienced practitioners to perform them — support the conclusion that the Act would "place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." Id. (emphasis and quotation marks omitted). So does the fact that every court to consider the issue has ruled that laws banning dismemberment abortions are invalid and that fetal demise methods are not a suitable workaround.[15] See Glossip v. Gross, 576 U.S. __, 135 S. Ct. 2726, 2740 (2015) ("Our review is even more deferential where, as here, multiple trial courts have reached the same finding, and multiple appellate courts have affirmed those findings."); cf. Cooper v. Harris, 581 U.S. __, 137 S. Ct. 1455, 1468 (2017) ("[A]ll

_____

pregnancies between weeks 15 and 18 — the period during which 85% of dismemberment abortions are performed — is unstudied. And there is also a dearth of medical research on the effect on women of successive doses of digoxin. Considering that digoxin fails up to 15% of the time and that a practitioner may not be trained in another method of fetal demise, the Act will in a significant number of cases leave the practitioner with no choice but to administer another and therefore experimental dose of digoxin on a woman before beginning the dismemberment abortion.

[15] See, e.g., Whole Woman's Health v. Paxton, 280 F. Supp. 3d 938, 940–41, 953–54 (W.D. Tex. 2017); Hopkins v. Jegley, 267 F. Supp. 3d 1024, 1058, 1061–65, 1111 (E.D. Ark. 2017); Planned Parenthood of Cent. N.J. v. Verniero, 41 F. Supp. 2d 478, 480, 500 (D.N.J. 1998), aff'd sub nom. Planned Parenthood of Cent. N.J. v. Farmer, 220 F.3d 127 (3d Cir. 2000); Evans v. Kelley, 977 F. Supp. 1283, 1290, 1318–20 (E.D. Mich. 1997).

else equal, a finding is more likely to be plainly wrong if some judges disagree with it.").[16]

2. Neither the Health Exception nor the Intent Requirement Saves the Act

The Act's health exception does not resolve the constitutional problems created by the fetal demise requirement.[17] That exception provides that an abortion practitioner may dismember an unborn child without first killing it when "necessary to prevent serious health risk" to the mother. Ala. Code § 26-23G-3(a). A "serious health risk" exists when:

> In reasonable medical judgment, the child's mother has a condition that so complicates her medical condition that it necessitates the abortion of her pregnancy to avert her death or to avert serious risk of substantial and irreversible physical impairment of a major bodily function, not including psychological or emotional conditions.

Id. § 26-23G-2(6).

---

[16] Swinging for the fences, the plaintiffs invite us to adopt a per se rule invalidating any law banning the "most commonly used second-trimester abortion method." We won't. The fact that dismemberment abortion is the most prevalent second-trimester abortion method does not mean that any law that bans or burdens it is automatically unconstitutional. The question is whether in light of the prohibition or restriction there remains an alternative method that is safe, effective, and available.

[17] The plaintiffs rely on a decision of the Sixth Circuit striking down a similar act, which held that "it is unnecessary for us to address exceptions to an unconstitutional and unenforceable general rule." Northland Family Planning Clinic, Inc. v. Cox, 487 F.3d 323, 340 (6th Cir. 2007). The conclusion in that case may have been correct but the logic leading to that conclusion is not. One cannot determine if this kind of Act is "unconstitutional and unenforceable" without deciding whether exceptions to its application avoid or cure any constitutional problem with it.

The State argues that "it makes no sense to say that the [Act] threatens a woman's health when it includes an express exception to allow the prohibited procedure when a woman's health is threatened."  Maybe so, but the exception does not apply to all threats to a woman's health.  It applies only when necessary to avoid death, or avoid a particular kind of risk of physical harm:  a "<u>serious</u> risk" of "<u>substantial and irreversible</u> physical impairment <u>of a major bodily function</u>."  <u>Id.</u> (emphasis added).  By its express terms, the health exception would not apply when complying with the Act would result in the woman being subjected to a serious risk of reversible, substantial physical impairment of a major bodily function.  (Even where the reversal of the impairment and the recovery of the woman took a long time.)  Nor would the exception apply to irreversible substantial physical impairments of a minor bodily function (whatever that is) — or two or three of them for that matter.

The State says not to worry, that it will not construe the health exception so narrowly.  Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them.  <u>See</u> <u>Stenberg</u>, 530 U.S. at 940–41, 120 S. Ct. at 2614 (rejecting the Attorney General's interpretation of the statute and warning against accepting as

35

authoritative a state's litigation position when it does not bind state courts or law enforcement authorities).

The State argues that whatever the problems with the health exception in general, it provides a safety valve when coupled with the umbilical cord transection method of fetal demise. If that procedure fails, the State believes the danger to the woman would be so great that the health exception would kick in and allow a practitioner to perform a dismemberment abortion on the still living unborn child. That theory assumes that a cord transection fails at a discrete point in time. It doesn't. Even when all goes according to plan, after the practitioner cuts the cord, the Act requires him to wait to dismember the unborn child until its heartbeat stops. During that time — one witness testified it can take as long as 13 minutes — the patient loses blood while undergoing contractions and placental separation. As she lies bleeding on the table, the practitioner must decide whether to wait for her to bleed even more in order to trigger the health exception, or to start the dismemberment of the unborn child and risk having a jury second guess his judgment that the risk to the woman's health justified doing so. The health exception is cold comfort to practitioners and women, regardless of which fetal demise method they attempt. There are enough problems with the health exception to prevent it from rescuing the Act from unconstitutionality.

36

Finally, the State suggests that the Act's intent requirement when combined with the umbilical cord transection method of fetal demise provides a work around for the constitutional problems.[18]  It starts with the proposition that the intent requirement shields from liability practitioners who accidentally cut fetal tissue when trying to cut the umbilical cord.  But a practitioner in that situation would have committed the prohibited conduct and would be subjecting himself to the tender mercies of a prosecutor's discretion and the vagaries of a jury's decision about his subjective intent moments before he began to dismember an unborn child.  See Ala. Code § 26-23G-2(3).  The practitioner would face that risk every time he performed cord transection because it is always possible he might accidentally grasp and cut fetal tissue instead of the cord.  Given that a prosecution and adverse jury determination could result in up to two years imprisonment and a $10,000 fine, it is no surprise that both plaintiff practitioners testified that they would not perform cord transections if the Act came into effect.  Even if the intent requirement would usually shield practitioners from liability, the risk that it might

---

[18] The State made only one passing reference to the intent requirement in its briefs in this appeal from the district court's permanent injunction ruling.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) ("[A]n appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").  But the State had elaborated on that argument in its briefs in the appeal from the preliminary injunction ruling and we have discretion to consider it.  In the interest of completeness, we will.

not would deter practitioners from performing dismemberment abortions, which would in turn deny women access to pre-viability abortions.

## IV. CONCLUSION

In our judicial system, there is only one Supreme Court, and we are not it. As one of the "inferior Courts," we follow its decisions. U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). The primary factfinder is the district court, and we are not it. Our role is to apply the law the Supreme Court has laid down to the facts the district court found. The result is that we affirm the judgment of the district court.

**AFFIRMED.**

38

DUBINA, Circuit Judge, concurring specially.

I concur fully in Chief Judge Carnes's opinion because it correctly characterizes the record in this case, and it correctly analyzes the law.  I write separately to agree on record with Justice Thomas's concurring opinion in *Gonzales v. Carhart*, 550 U.S. 124, 168-69, 127 S. Ct. 1610, 1639-40 (2007) (Thomas, J., concurring), with whom then Justice Scalia also joined.  Specifically, Justice Thomas wrote, "I write separately to reiterate my view that the Court's abortion jurisprudence, including *Casey* [*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 112 S. Ct. 2791 (1992)] and *Roe v. Wade*, 410 U. S. 113, 93 S. Ct. 705 (1973), has no basis in the Constitution."  *Id.* at 169, 127 S. Ct. at 1639.  The problem I have, as noted in the Chief Judge's opinion, is that I am not on the Supreme Court, and as a federal appellate judge, I am bound by my oath to follow all of the Supreme Court's precedents, whether I agree with them or not.

Therefore, I concur.

ABRAMS, District Judge:

I concur in the judgment only.