# SUPREME COURT OF THE UNITED STATES

––––––

No. 25A608

––––––

## GREG ABBOTT, ET AL. *v.* LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ET AL.

ON APPLICATION FOR STAY

[December 4, 2025]

With an eye on the upcoming 2026 midterm elections, several States have in recent months redrawn their congressional districts in ways that are predicted to favor the State's dominant political party. Texas adopted the first new map, then California responded with its own map for the stated purpose of counteracting what Texas had done. North Carolina followed suit, and other States are also considering new maps.

Respondents in this case challenged the new Texas map, contending that the legislature's motive was predominantly racial. A divided three-judge District Court agreed and enjoined the use of the new map in the 2026 elections. With the 2026 campaign underway, the State of Texas and several of its officials applied to this Court for a stay.

Based on our preliminary evaluation of this case, Texas satisfies the traditional criteria for interim relief. See *Indiana State Police Pension Trust* v. *Chrysler LLC*, 556 U. S. 960 (2009) (*per curiam*). Texas is likely to succeed on the merits of its claim that the District Court committed at least two serious errors. First, the District Court failed to honor the presumption of legislative good faith by construing ambiguous direct and circumstantial evidence against the legislature. Contra, *Alexander* v. *South Carolina State Conference of the NAACP*, 602 U. S. 1, 10 (2024). Second, the District Court failed to draw a dispositive or near-dispositive adverse inference against respondents even

though they did not produce a viable alternative map that met the State's avowedly partisan goals. Contra, *id.*, at 34–35.

Texas has also made a strong showing of irreparable harm and that the equities and public interest favor it. "This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican National Committee* v. *Democratic National Committee*, 589 U. S. 423, 424 (2020) (*per curiam*). The District Court violated that rule here. The District Court improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections.

The application for stay presented to JUSTICE ALITO and by him referred to the Court is granted. The November 18, 2025 order entered by the United States District Court for the Western District of Texas, case No. 3:21–cv–259, is stayed pending the timely filing of an appeal in this Court. Should a notice of appeal and jurisdictional statement be timely filed, this order shall remain in effect pending this Court's action on the appeal. If the appeal is dismissed, or the judgment is affirmed, this order will terminate automatically. In the event that jurisdiction is noted or postponed, this order will remain in effect pending the sending down of the judgment of this Court.

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, concurring in the grant of the application for stay.

I join the order issued by the Court. Texas needs certainty on which map will govern the 2026 midterm elections, so I will not delay the Court's order by writing a detailed response to each of the dissent's arguments. Instead, I offer two short points which for me are decisive.

First, the dissent does not dispute—because it is indisputable—that the impetus for the adoption of the Texas

ALITO, J., concurring

map (like the map subsequently adopted in California) was partisan advantage pure and simple.

Second, the clear-error standard of review does not apply here because the "'trial court base[d] its findings upon a mistaken impression of applicable legal principles.'" *Alexander* v. *South Carolina State Conference of the NAACP*, 602 U. S. 1, 18 (2024). Because of the correlation between race and partisan preference, litigants can easily use claims of racial gerrymandering for partisan ends. *Cooper* v. *Harris*, 581 U. S. 285, 335 (2017) (ALITO, J., concurring in judgment in part and dissenting in part). To prevent this, our precedents place the burden on the challengers "to disentangle race and politics." *Alexander*, 602 U. S., at 6. Thus, when the asserted reason for a map is political, it is critical for challengers to produce an alternative map that serves the State's allegedly partisan aim just as well as the map the State adopted. *Id.*, at 34; *Easley* v. *Cromartie*, 532 U. S. 234, 258 (2001). Although respondents' experts could have easily produced such a map if that were possible, they did not, giving rise to a strong inference that the State's map was indeed based on partisanship, not race. Neither the duration of the District Court's hearing nor the length of its majority opinion provides an excuse for failing to apply the correct legal standards as set out clearly in our case law.

# SUPREME COURT OF THE UNITED STATES

_____

No. 25A608
_____

## GREG ABBOTT, ET AL. *v.* LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ET AL.

### ON APPLICATION FOR STAY

[December 4, 2025]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and JUSTICE JACKSON join, dissenting from the grant of the application for stay.

Over the course of three months, a three-judge District Court in Texas undertook to resolve the factual dispute at issue in this application: In enacting an electoral map slanted toward Republicans, did Texas predominantly use race to draw its new district lines? Or said otherwise, did Texas accomplish its partisan objectives by means of a racial gerrymander? The District Court conducted a nine-day hearing, involving the testimony of nearly two dozen witnesses and the introduction of thousands of exhibits. It sifted through the resulting factual record, spanning some 3,000 pages. It assessed the credibility of each of the witnesses it had seen and heard in the courtroom. And after considering all the evidence, it held that the answer was clear. Texas largely divided its citizens along racial lines to create its new pro-Republican House map, in violation of the Constitution's Fourteenth and Fifteenth Amendments. The court issued a 160-page opinion recounting in detail its factual findings.

Yet this Court reverses that judgment based on its perusal, over a holiday weekend, of a cold paper record. We are a higher court than the District Court, but we are not a better one when it comes to making such a fact-based decision. That is why we are supposed to use a clear-error

standard of review—why we are supposed to uphold the District Court's decision that race-based line-drawing occurred (even if we would have ruled differently) so long as it is plausible. Without so much as a word about that standard, this Court today announces that Texas may run next year's elections with a map the District Court found to have violated all our oft-repeated strictures about the use of race in districting. Today's order disrespects the work of a District Court that did everything one could ask to carry out its charge—that put aside every consideration except getting the issue before it right. And today's order disserves the millions of Texans whom the District Court found were assigned to their new districts based on their race. Because this Court's precedents and our Constitution demand better, I respectfully dissent.

I

Recall the state of the world last spring, before mid-decade, overtly partisan redistricting (in both red and blue States) became *de rigueur*. In those months, President Trump and his political team urged Texas officials to redraw their House map, with the goal of creating more Republican seats and protecting that party's vulnerable majority. The project was on no one's legislative agenda. Texas officials had created a new map, per usual, in response to the population shifts revealed in the 2020 census. And those officials expected that the State's next map, again per usual, would follow the 2030 count. A mid-decade redistricting, absent some legal need, was then nearly unheard of. And although no one could challenge a partisan gerrymander in court—our decision in *Rucho* v. *Common Cause*, 588 U. S. 684 (2019), saw to that—voters could hold those supporting it to political account. (Again, this was in those innocent days—prior to Texas's redistricting—when partisan gerrymanders seemed undemocratic or at least unsavory, rather than a mark of political conviction or

loyalty.) For those reasons (and perhaps for fear of dummymandering too), the Trump Administration's campaign for a new, partisan redistricting got little traction. See App. to Application for Stay 2, 15–17. On June 10, State Senator Joan Huffman—the sponsor of the 2021 map—testified in a judicial proceeding that the legislature was not considering redrawing its map. See *id.*, at 17. And on June 23, Governor Greg Abbott announced that he was calling a special legislative session to address various matters—but redistricting was conspicuously not among them. *Id.*, at 16.

With so little to show for its efforts, the Trump Administration switched tacks—converting its political importuning into a legal demand. On July 7, the Department of Justice's Civil Rights Division sent the Texas Governor and Attorney General a letter—to serve, it said, "as formal notice"—describing the office's "serious concerns regarding the legality of four of Texas's congressional districts." *Id.*, at 17. The letter focused on those districts' racial composition. Each was described as a "coalition district"—meaning a district in which two or more minority groups (say, Blacks and Hispanics) can *together* form a majority and elect a candidate of their choice. (In racially diverse places like Texas, such districts are not uncommon.) The letter stated—quite incorrectly (no one now tries to defend the proposition)—that the creation of those districts was unlawful: "It is well-established that so-called 'coalition districts' run afoul [of] the Voting Rights Act and the Fourteenth Amendment." *Id.*, at 18. Accordingly, the letter maintained, they "must now be corrected"—"rectified immediately by [the] state legislature[]." *Ibid.* The letter concluded that Texas should bring its current districting scheme "into compliance" with the (supposed) law, or else risk the U. S. Attorney General "seek[ing] legal action against the State." *Id.*, at 19.

With that letter, Texas's attitude changed. Once the Administration's redistricting proposal came packaged as a legal ultimatum to change various districts' racial

composition, Texas embraced it. Two days after receiving DOJ's letter, the until-then-reluctant Governor Abbott issued a proclamation adding the following to the agenda for the upcoming special legislative session: "Legislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U. S. Department of Justice." *Id.*, at 30–31. And in late August, the legislature enacted a new map—one that *both* secured five more Republican-leaning seats *and* "achieved all but one of the racial objectives that DOJ demanded." *Id.*, at 3. The map "dismantled and left unrecognizable" the districts that DOJ's letter had identified, along with several similar coalition districts. *Ibid.* And it made three of those districts into majority-Black or majority-Hispanic districts by the smallest amount possible, with the majority in each coming in at between 50.2 and 50.5 percent. *Id.*, at 97.

## II

The plaintiffs here challenged Texas's new map as a racial gerrymander, in violation of the Fourteenth and Fifteenth Amendments. They did not contest that politics motivated the Trump Administration's redistricting scheme, or that politics made Republican state legislators glad to vote for the map eventually developed. But it was race, the plaintiffs argued, that gave the redistricting plan life—by enabling state officials to present it as a legal necessity rather than a partisan gambit. And most important, they contended, it was race that mainly accounted for where the new, Republican-friendly lines were drawn.

The law respecting a racial-gerrymander claim is well settled. The Constitution forbids a State, absent a compelling justification, from "separat[ing] its citizens into different voting districts on the basis of race." *Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U. S. 178, 187 (2017). To prove such racial sorting, the plaintiffs must show that race was the "predominant factor motivating the

legislature's decision to place a significant number of voters within or without a particular district." *Alexander* v. *South Carolina State Conference of the NAACP*, 602 U. S. 1, 7 (2024). They can do so through "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper* v. *Harris*, 581 U. S. 285, 291 (2017) (quoting *Miller* v. *Johnson*, 515 U. S. 900, 916 (1995)). And notably here, nothing changes just because the legislature has drawn race-based lines "in order to advance [non-race-based] goals, including political ones." *Cooper*, 581 U. S., at 291, n. 1. So it is unconstitutional (sans a compelling interest) for "legislators [to] use race as their predominant districting criterion with the end goal of advancing their partisan interests." *Id.*, at 308, n. 7.

Texas's only defense to the racial-gerrymander claim here is that no such gerrymander happened. In other words, Texas does not assert a compelling interest in drawing lines based on race. Texas has never argued in this litigation that the DOJ letter was right—that it had to redistrict according to race in order to correct an existing legal violation. And Texas of course does not contend that the pursuit of partisan advancement is itself a compelling interest. (It is not.) All Texas has ever said in response to the plaintiffs' suit is that race had nothing to do with its redistricting process. According to the State, its officials acted only to protect Republican incumbents in the House and to pick up another five predictably Republican seats. In particular, Texas says, racial data never entered into the line-drawing process, even though the mapmaker had that data available at the press of a key on his redistricting software. Any striking racial features of the new map were mere happenstance, Texas contends—a coincidence born of the correlation between race and partisan preference.

The District Court's task, then, was a singularly factual one: It had to choose between the plaintiffs' "race predominated" account and the State's "race never entered the

picture" story.  To do so, it held a nine-day hearing during
which it heard from 23 witnesses, received into evidence
thousands of exhibits, and watched many hours of video
footage of legislators and Governor Abbott discussing the
proposed map as it was under consideration.  After as-
sessing the credibility of the witnesses and weighing all the
competing evidence, the District Court decided that the
merits were "clearcut" in favor of the plaintiffs.  App. 152.
True, the ultimate goal of Texas's redistricting was to pick
up Republican seats.  But "[s]ubstantial evidence" revealed
that race predominated in the actual drawing of district
lines.  *Id.*, at 2.  So, the District Court concluded, in acting
to advance partisan interests, "Texas racially gerryman-
dered the 2025 Map."  *Ibid.*

In support of that conclusion, the District Court described
three kinds of direct evidence, cumulatively "strong," that
race had played a predominant role in redistricting.  *Id.*, at
59.  First, "[w]hat triggered the redistricting process" was
the "Administration reframing the request" to do partisan
districting "in exclusively racial terms."  *Id.*, at 62.  Here,
the crucial fact was the DOJ letter.  That letter, to be sure,
did not specify exactly how Texas should "rectify" and "cor-
rect[]" its supposedly illegal coalition districts.  *Id.*, at 59.
But (the court explained) "there's only one way to remedy a
district whose only 'objectionable' characteristic is that no
single racial group constitutes a 50% majority": to "redraw
[the district] so a single racial group constitutes a 50% ma-
jority."  *Ibid.*  The DOJ letter thus "impos[ed] a 50% racial
target for Texas to meet when redrawing" certain districts.
*Ibid.*  And it thereby "directed Texas to engage in racial ger-
rymandering."  *Ibid.*

Second, the District Court described how the Governor
promptly "ask[ed] the Legislature to give DOJ the racial re-
balancing it wanted—and for the reasons that DOJ cited."
*Id.*, at 31.  Although he had resisted redistricting for
months, it took the Governor just two days from receipt of

the DOJ letter to add to the legislative agenda a proposal for responding to the "constitutional concerns raised" about certain districts' racial composition. *Ibid.*; see *supra*, at 3–4. And the court noted that, from that point on, the Governor consistently expressed support for the new map in those same racial terms: as a means to convert coalition districts into majority-Hispanic or majority-Black districts. See App. 31–34. In one interview, for example, he stated that "we wanted to remove those coalition districts and draw them in ways that, in fact, turned out to provide more seats for Hispanics." *Id.*, at 32; see also *id.*, at 33, n. 115 ("[W]e want to make sure that we have maps that don't impose coalition districts"; "we're able to take the people who were in those coalition districts and make sure they are going to be in districts that really represent the[ir] voting preferences"). And conversely, the District Court related, Governor Abbott consistently "rejected the idea that Texas was redistricting to fulfill President Trump's demand for additional Republican districts." *Id.*, at 64. The Governor maintained, for example, that the map drew Hispanic seats, not Republican ones: "It just coincides it's going to be Hispanic Republicans elected to those seats" given that more Hispanics were "align[ing] with Republicans." *Id.*, at 32; see also *id.*, at 34, n. 117 (The "districts we are drawing, they would be Hispanic districts" that just so "happen to be Hispanic Republican districts").

And third, the District Court found that legislators, including the redistricting bill's primary sponsors, repeatedly spoke in the same way: They "suggest[ed] that they had intentionally manipulated the districts' lines to create more majority-Hispanic and majority-Black districts." *Id.*, at 3. The legislator who introduced the bill, for example, crowed: "[W]e created four out of five new seats" to have a "Hispanic majority. I would say that's great. That doesn't ensure that a political party wins them, but the Hispanic—four out of five Hispanic majority out of those new districts—that's a

pretty strong message, and it's good." *Id.*, at 73, n. 258; see also *id.*, at 75, n. 265 (another legislator boasting that "previously, Black voters in that district did not hold a majority, but under [the new plan], they actually do"); *id.*, at 76, n. 267 (yet another legislator noting that one district was "purposely altered to [be] a Black [Citizen Age Voting Population (CVAP)] majority district" and another was "purposely changed to increase its Hispanic CVAP"). The District Court, in reviewing the legislative evidence, well understood that partisan motivations underlay the new plan. See, *e.g.*, *id.*, at 76. But the bill's backers, the court explained, "strategized that a map that eliminated coalition districts and increased the number of majority-Hispanic and majority-Black districts would be more 'sellable' than a nakedly partisan map." *Ibid.* Such a map would allow legislators to "deny they were redistricting for purely partisan reasons" and to gain more public support for the endeavor, especially among Hispanic Texans. *Ibid.*

Circumstantial evidence, the court continued, confirmed what the direct evidence showed: that race predominated in the drawing of district lines. The new plan "fulfilled" almost all the racial goals "that DOJ and the Governor desired"; indeed, the map dismantled even more coalition districts than the DOJ letter had identified. *Id.*, at 105; see *id.*, at 50. And most strikingly, the court noted, the map's conversion of three of those coalition districts into majority-Black or majority-Hispanic districts was accomplished by the barest of margins—half a percentage point or still less. So, the District Court recounted, one district went from 25.6% to 50.3% Hispanic; another went from 38.8% to 50.5% Black; and yet a third went from 46.0% to 50.2% Black. See *id.*, at 97. The court found it "very unlikely" that a mapmaker relying only on race-neutral criteria and using only non-racial data would "have hit a barely 50% CVAP *three times* by pure chance." *Id.*, at 98. It was uncontested that racial data came preloaded into the mapmaker's

redistricting software, so he could look at it anytime he wanted. The mapmaker testified to the court that he had not done so. See *id.*, at 91. But the court, noting that the mapmaker was "well aware" of the DOJ letter—indeed, that he had been shown a draft by White House officials before it was sent—"question[ed] [his] veracity" and "discredit[ed]" his testimony. *Id.*, at 96, 98, 99. It was, the court concluded, "far more plausible that [the mapmaker] had both racial and partisan data turned on while drawing the 2025 Map and that he used the former to achieve the racial targets that DOJ and the Governor had explicitly announced as he simultaneously used the latter to achieve his partisan goals." *Id.*, at 99.

And that conclusion was confirmed by expert testimony. One of the expert witnesses testified that she had "generated tens of thousands of congressional maps that follow traditional districting criteria and favor Republicans by various metrics"—in other words, that eschewed racial goals and racial data. *Id.*, at 127. The result? "[N]ot one of them had racial demographics that looked anything like those in the 2025 Map." *Ibid.* The expert's analysis thus supported what the raw numbers (*e.g.*, those three 50% districts) showed: It was—once again—"highly unlikely" that a legislature drawing a map based on "partisan and other race-neutral considerations" would have arrived at the one Texas enacted. *Id.*, at 121.

Put all of that together—the direct and circumstantial evidence alike—and the District Court's conclusion followed: The plaintiffs were likely to succeed on their racial-gerrymandering claim. The desire for more Republican seats no doubt motivated the redistricting project: It was, as this Court has said, the officials' "end goal." *Cooper*, 581 U. S., at 308, n. 7. But the district lines drawn resulted predominantly "from the intentional manipulation of the districts' racial makeup." App. 127. Race provided the excuse for the partisan effort. And yet more critically, race provided the

key means of implementing it.  And that, the District Court
held, is a violation of the Fourteenth and Fifteenth Amend-
ments.

## III
### A

This Court owes, though today has not given, "significant
deference" to the District Court's marshaling and weighing
of so much evidence.  *Cooper*, 581 U. S., at 293.  You would
never guess it from the majority's order, but under this
Court's precedents, a district court's factfinding about elec-
toral districting—"most notably, as to whether racial con-
siderations predominated in drawing district lines"—is re-
versible "only for clear error."  *Ibid.*; see *Alexander*, 602
U. S., at 18 (describing that test as "demanding").  Under
that standard, "we may not reverse just because we would
have decided the matter differently."  *Cooper*, 581 U. S., at
293.  If a district court's factual determination is "'plausible'
in light of the full record—even if another is equally or more
so"—that determination "must govern."  *Ibid.* (quoting *An-
derson* v. *Bessemer City*, 470 U. S. 564, 574 (1985)).  And in
deciding what is thus "plausible," we must "give singular
deference to a trial court's judgment about the credibility of
witnesses."  *Cooper*, 581 U. S., at 309.  The district court
has conducted the hearing and knows the whole record.  It
is better positioned than this Court to decide what evidence
to credit about the drawing of district lines.

Taking that standard seriously calls for denying Texas's
stay application.  In its 160-page opinion, the District Court
marched methodically through the entirety of the trial rec-
ord.  The court considered with care the evidence support-
ing Texas, as well as that supporting the plaintiffs.  See,
*e.g.*, App. 79–104, 128–134.  The court explained each of the
credibility judgments it rendered—noting, to take just one
example, how one witness's testimony conflicted with other
evidence, including another witness's testimony. See, *e.g.*,

*id.*, at 96–99 (discussing the mapmaker's testimony). Ultimately, the court weighed all the evidence and made findings, summarized above, about how Texas's map was constructed. I do not say that those findings were inescapable; a court coming out the opposite way could well have deserved this Court's deference too. What they were—and this is the thing that matters on clear-error review—is plausible. It was "plausible"—perfectly plausible "in light of the full record"—that Texas drew its new map mainly on racial lines. *Cooper*, 581 U. S., at 293. (Indeed, I think—though this is not necessary—that the court's conclusion was right.)

In asserting instead that the court's conclusion was "implausible," Texas argues that because it was trying to "maximize[] partisan advantage," it would have relegated all racial considerations to the sidelines. Application 11. But that claim is too simple by half, as this Court has previously recognized. Because of the "strong correlation[s] between race and voting behavior," we have explained, States may well avail themselves of "race-based districting for ultimately political reasons"—that is, "to advance their partisan interests." *Cooper*, 581 U. S., at 319, n. 15; see *id.*, at 291, n. 1. So, for example, legislators may "think[] that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing." *Id.*, at 308, n. 7. That is just what the District Court found that key Texas lawmakers thought in creating and supporting the redistricting plan. See App. 3, 76; see *supra*, at 8. The District Court knew—explained repeatedly—that partisan motives lay beneath the new map. See, *e.g.*, App. 2–3, 76–77. But so too the court found that race was all over it. The lawmakers created new Republican seats while—indeed, by means of—converting coalition districts into single-race majority-minority districts. And once again, because that conclusion

is "plausible in light of the full record," it "must govern."
*Cooper*, 581 U. S., at 293.

For its part, the majority complains—just as wrongly—
that the District Court made a "serious error[]" in "fail[ing]
to honor the presumption of legislative good faith." *Ante*, at
1. That presumption is, to be sure, a well-settled part of our
districting law. Because of the complexity of electoral dis-
tricting, we have explained, the State's good faith must be
presumed "until a claimant makes a showing" of "race-
based decisionmaking." *Miller*, 515 U. S., at 915. But con-
tra the majority, the District Court properly extended
Texas that presumption. It explained that federal courts
"must exercise extraordinary caution in adjudicating"
racial-gerrymandering claims. App. 57 (quoting *Alexander*,
602 U. S., at 7). And it then stated what that caution en-
tails in much the same terms as today's majority uses:
When considering evidence that could support either a ra-
cial or a non-racial account of a districting action, the court
had to "draw the inference that cuts in the legislature's fa-
vor." App. 58 (quoting *Alexander*, 602 U. S., at 10); compare
*ante*, at 1 (calling for "ambiguous" evidence to be "con-
stru[ed]" in the legislature's favor). In line with that under-
standing, the District Court found that certain legislators'
statements were too ambiguous to "clear the presumption
of legislative good faith." App. 71–72, and n. 251 (again
quoting *Alexander*, 602 U. S., at 10). But other evidence,
direct and circumstantial alike, was not; and as all the rec-
ord evidence piled up, the court concluded that state offi-
cials "purposefully manipulated the districts' racial num-
bers." App. 77. Presumptions, after all, can be
simultaneously "honor[ed]" and overcome. *Ante*, at 1. And
so it was here, as the District Court assessed credibility and
found facts—as, in the end, district courts must.

The majority likewise is wrong to say that the District
Court erred in "fail[ing] to draw a dispositive or near-
dispositive adverse inference" against the plaintiffs for

their failure to "produce a viable alternative map" that met the State's partisan goals without the enacted map's racial features. *Ante*, at 1–2 (citing *Alexander*, 602 U. S., at 34–35). In fact, the District Court's treatment of the "alternative map" issue fully accords with our instructions in *Alexander*—a case which, like this one, involved the "disentangl[ing]" of race and politics in redistricting. 602 U. S., at 6. We first stated in *Alexander* that the absence of a substitute map merits an adverse inference in a racial gerrymander case. See *id.*, at 34–35. And in line with that edict, the District Court drew one. See App. 132. We next said in *Alexander* that the inference thus drawn would be "dispositive" (*i.e.*, fatal) only some of the time. *Alexander*, 602 U. S., at 35. When would it be so? *Alexander* answered: "The adverse inference may be dispositive in many, if not most, cases where the plaintiff lacks direct evidence." *Ibid.* The District Court quoted that language, and explained why it did not force a dispositive inference here. In short, because there was lots of direct evidence. See App. 132. Or as the District Court stated more fully: "Unlike the challengers in *Alexander*, who 'provided no direct evidence of a racial gerrymander,' the Plaintiff Groups here have produced substantial direct evidence indicating that race was the predominant driver in the 2025 redistricting process." *Ibid.* (quoting *Alexander*, 602 U. S., at 18). So a racial gerrymander could be found, under *Alexander*'s own terms, despite the lack of a map. That is because the map's absence does not make the direct evidence of race-based decisionmaking go away.*

---

*After explaining why the adverse inference was not dispositive in this case, the District Court also speculated that it might not have had to draw the inference at all because the case was at such an early stage. App. 132. (Here, the court noted that the expert testimony suggested that the plaintiffs would have had no trouble coming up with a map, so that their failure to do so likely reflected a lack of time. See *id.*, at 134.) This Court has not specifically opined on that matter one way or another.

What, then, does the majority think is wrong?  One pos-
sibility lies in the word "near-dispositive" in today's order.
*Ante,* at 1.  Perhaps the majority has a theory about why,
despite all the direct evidence, a "near-dispositive" infer-
ence was still appropriate?  If so, that is made up for the
occasion.  The word "near-dispositive" does not appear in
*Alexander*, which everyone agrees is the critical decision ad-
dressing alternative maps.  Nor does that term appear in
any other of this Court's decisions respecting adverse infer-
ences (of any type).  (Actually, the word appears only three
times in the whole U. S. Reports.  See, *e.g., Rogers* v. *Ten-
nessee*, 532 U. S. 451, 473, n. 2 (2001) (Scalia, J., dissenting)
(referring to "[t]he near-dispositive strength Blackstone ac-
corded *stare decisis"*).)  So it is hardly surprising that the
District Court did not address whether a "near-dispositive"
inference was called for; and the court's "fail[ure]" to do so
can play no proper role in today's order.  *Ante,* at 1–2.  The
remaining possibility—no more excusable for an appellate
court—is that the majority is simply second-guessing the
District Court's factfinding.  That court, to repeat, rejected
treating the adverse interest as dispositive (as *Alexander*
permits) because of the "substantial direct evidence" of
race-based districting.  So maybe the majority is just saying
that it sees no such evidence—that it interprets all the facts
differently, as reflective of only partisan districting, with no
racial component.  But on clear-error review, what basis
does the majority have to thus substitute its understanding
of the direct evidence for the District Court's?  The short
answer is: It has none.

-----

But even assuming the adverse inference is appropriate at every stage of
the litigation, the primary rationale of the District Court stands: The ad-
verse inference was not dispositive because of all the direct evidence in
the case.

### B

Nor does the majority have any warrant to stay the District Court's order for "alter[ing] the election rules on the eve of an election." *Ante,* at 2. Here, the majority invokes (though without naming) the so-called *Purcell* principle. See *Purcell* v. *Gonzalez*, 549 U. S. 1, 4–5 (2006) (*per curiam*). Under that decision, courts deciding whether to enjoin an election rule or map in the lead-up to an election must consider, among other relevant equitable factors, the order's potential for causing "voter confusion." *Ibid.* It is an important caution. And it is one the District Court took seriously, considering how everything this Court has said on the subject applied to the facts at hand. See App. 140–156. In then going ahead, the court was right.

Texas is not on "the eve of an election," as was true in the case the majority cites. *Republican National Committee* v. *Democratic National Committee*, 589 U. S. 423, 424 (2020) (*per curiam*); see *ante,* at 2. The election there was five days after the injunction. Similarly, the election in *Purcell* was "just weeks" away. 549 U. S., at 4. Here, Election Day is eleven months from now. Even the primary election (which Texas could change) is in March. The District Court carefully listed the various "election preparations" underway to switch to the 2025 map. App. 144. On the other hand, the court noted how the 2021 map—which the injunction reinstated—was, in a real sense, the status quo. See *id.*, at 145. Officials, candidates, and voters are all familiar with it from the last two election cycles. Until late last summer, everyone expected that map to govern 2026 too. And indeed, it will be used in a special runoff election in the State's largest county on January 31, 2026. So, the District Court properly concluded, "[a]n injunction in this case would not cause significant disruption." *Id.*, at 144. Except to the extent all of us live in election season all the time, the 2026 congressional election is not well underway.

And even supposing it is now the ninth or tenth hour,
whose choice was that?  It was of course the Texas legisla-
ture that decided to change its map six months before a
March primary.  The plaintiffs could not have moved any
faster: They requested an injunction before the new law was
even signed.  And to try to speed the litigation, they de-
clined discovery.  (That decision, by the way, probably ac-
counted for their failure to submit an alternative map,
which to be probative must be based on the State's particu-
lar districting criteria.  See *supra*, at 13 n.)  The District
Court moved expeditiously too, issuing its 160-page opinion
(on November 18) just a month after post-hearing briefing
concluded.  No one dilly-dallied in this case.  The District
Court ruled as "late" as it did because the legislature en-
acted a new map less than three months before.

If *Purcell* prevents such a ruling, it gives every State the
opportunity to hold an unlawful election.  The District
Court, once again aptly, made the point: Were judicial re-
view so broadly foreclosed, then to implement even a "bla-
tantly unconstitutional map," the "Legislature would need
only to pass" it on a schedule like this one.  App. 154–155.
That cannot be the law—except of course that today it is.
According to the majority, Texas had a free pass to redis-
trict in August 2025 for the 2026 House elections.  See *ante,*
at 2.  All that the plaintiffs can hope for is better luck in
2028.

                              IV

The majority today loses sight of its proper role.  It is sup-
posed to review the District Court's factfinding only for
clear error.  But under that deferential standard, the Dis-
trict Court's "plausible" (actually, quite careful) factfinding
must survive.  The majority can reach the result it does—
overturning the District Court's finding of racial line-
drawing, even if to achieve partisan goals—only by

arrogating to itself that court's rightful function.  We know better, the majority declares today.  I cannot think of a reason why.

And this Court's eagerness to playact a district court here has serious consequence.  The majority calls its "evaluation" of this case "preliminary."  *Ante,* at 1.  The results, though, will be anything but.  This Court's stay guarantees that Texas's new map, with all its enhanced partisan advantage, will govern next year's elections for the House of Representatives.  And this Court's stay ensures that many Texas citizens, for no good reason, will be placed in electoral districts because of their race.  And that result, as this Court has pronounced year in and year out, is a violation of the Constitution.